Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/13/2019 08:06 AM CDT

In re Interest of Becka P. et al.,
children under 18 years of age.
State of Nebraska, appellee and cross-appellee, v.
Robert P., appellant, and Veronica M.,
appellee and cross-appellant.

___ N.W.2d ___

Filed August 6, 2019.    Nos. A-18-884 through A-18-887.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another.

2. **Parental Rights: Rules of Evidence: Due Process.** The Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights.

3. ____: ____: ____. In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost.

4. **Parental Rights: Rules of Evidence: Due Process: Appeal and Error.** Rather than the formal rules of evidence, an appellate court evaluates the admission of evidence in termination of parental rights cases using a due process analysis.

5. **Constitutional Law: Due Process.** Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker.

6. **Juvenile Courts: Parental Rights: Proof.** For a juvenile court to terminate parental rights under Neb. Rev. Stat. § 43-292 (Reissue 2016), it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. The State must prove these facts by clear and convincing evidence.

7. **Parental Rights: Proof.** Neb. Rev. Stat. § 43-292(7) (Reissue 2016) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent.

8. **Parental Rights.** In a case of termination of parental rights based on Neb. Rev. Stat. § 43-292(7) (Reissue 2016), the protection afforded the rights of the parent comes in the best interests step of the analysis.

9. **Parental Rights: Evidence: Appeal and Error.** If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in Neb. Rev. Stat. § 43-292 (Reissue 2016), the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground.

10. **Parental Rights: Proof.** In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child.

11. **Constitutional Law: Parental Rights: Proof.** A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit.

12. **Parental Rights: Presumptions: Proof.** There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit.

13. **Constitutional Law: Parental Rights: Words and Phrases.** In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being.

14. **Parental Rights.** The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts.

15. **Parental Rights: Parent and Child.** In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts

- 491 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

should look for the parent's continued improvement in parenting skills
and a beneficial relationship between parent and child.

16. **Parental Rights: Appeal and Error.** Where termination of parental
rights is based on Neb. Rev. Stat. § 43-292(7) (Reissue 2016), appellate
courts must be particularly diligent in their de novo review of whether
termination of parental rights is in fact in the child's best interests.

17. **Parental Rights.** Where a parent is unable or unwilling to rehabilitate
himself or herself within a reasonable time, the best interests of the child
require termination of the parental rights.

18. ____. Children cannot, and should not, be suspended in foster care or be
made to await uncertain parental maturity.

Appeal from the County Court for Garden County: RANDIN
R. ROLAND, Judge. Affirmed.

Robert S. Harvoy for appellant.

Philip E. Pierce, Garden County Attorney, for appellee State
of Nebraska.

Jaquelin G. Leef, of Sonntag, Goodwin & Leef, P.C., for
appellee Veronica M.

Steven E. Elmshaeuser, guardian ad litem.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Robert P. (Bob) appeals, and Veronica M. cross-appeals,
from an order of the Garden County Court sitting as a juvenile
court, terminating their parental rights to four of their children.
Upon our de novo review of the record, we affirm the juvenile
court's order.

## II. BACKGROUND

Bob and Veronica are the parents of Becka P., born in July
2011; Robert P., Jr., born in July 2013; Thomas P., born in
October 2014; and Brandy P., born in November 2016. Bob
and Veronica are also the parents of a fifth child, Brittney P.,

- 492 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

born in December 2017. However, the termination trial did not involve Brittney. Accordingly, Brittney is not part of the appeal before us now and she will only be discussed as necessary to address Bob's and Veronica's assigned errors.

In December 2015, separate petitions were filed to adjudicate Becka, Robert, and Thomas pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015) based on the actions of both parents. Becka, Robert, and Thomas were adjudicated in February 2016. The basis of the adjudication was the parents' failure to use proper car seats on a regular basis. The petition also included concerns in regard to the children's being developmentally delayed. A petition to adjudicate Brandy was filed in December 2016, and she was adjudicated in April 2017. Becka, Robert, Thomas, and Brandy were removed from the parental home on December 16, 2016. They have remained out of the home since that time.

On July 31, 2018, the State filed a motion for termination of Bob's and Veronica's parental rights in regard to the four children, alleging statutory grounds to terminate existed pursuant to Neb. Rev. Stat. § 43-292(2), (3), (5), (6), and (7) (Reissue 2016), and alleging that termination was in the best interests of the children. A termination trial was held over the course of 4 days in August 2018.

The evidence showed that the family first became involved with the Nebraska Department of Health and Human Services (Department) in 2013 based on the living conditions of the home and Becka's being developmentally delayed. At that time, only Becka and Robert were born. The case was dismissed when the family moved into an acceptable home and educational services were being provided for Becka, which Bob and Veronica agreed to continue. Shortly after the case was dismissed, Bob would not allow the continuation of the educational services.

In 2015, the Department investigated the family on two separate occasions based on intakes involving allegations of abuse and neglect. Voluntary services were offered to the

- 493 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

family both times, but they were denied. As previously stated, the present case began in January 2016 when petitions to adjudicate Becka, Robert, and Thomas were filed. The petition to adjudicate Brandy was filed in December 2016.

Sonya Oliverius, who supervises caseworkers for the Department, became involved with the case when Becka, Robert, and Thomas were adjudicated in February 2016. She testified that during her time assigned to the case, Bob did not want to participate in services that were offered by the Department and would argue with her or tell her that either she or the Department had done something wrong. She testified that Veronica "pretty much followed whatever Bob's directions were" and that Bob made all the decisions. Oliverius testified that Bob had threatened her life and that he made her aware he knew where she lived, her husband's name, and what school and daycare her children attended. As a result of Bob's threats and innuendos, Oliverius obtained a protection order against him in December 2016. The caseworker at the time also obtained a protection order against Bob. Oliverius and that caseworker discontinued working on the case in December 2016 after they obtained the protection orders.

During the time Oliverius was involved with the case, an educational surrogate was appointed because Bob would not sign a release for "Early Development Network" to do evaluations of the children. The evaluations were only completed after the educational surrogate signed the necessary documents. Bob and Veronica also did not take the children to the doctor and would not allow the children to be immunized. Oliverius also testified that it was difficult to assess whether the home was safe and stable because Bob often refused to let Department workers into the home. Oliverius further testified that the only goal the parents met in regard to the case plan was in regard to using car seats. She testified that Bob and Veronica learned about the proper car seats for the children, but the only reason the goal was met was because someone brought the car seats to the home and installed them for the parents.

- 494 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

Dennis O'Brien was the caseworker assigned to do an initial investigation of the family in December 2016 and was assigned to the case until January 2018. He was reassigned the case in May 2018 and was still assigned to the case at the time of trial. He testified that as a result of his initial investigation, he made the decision to remove the children from the home on December 16, 2016. After their removal, the children were examined by a doctor. The doctor discovered that the children had "pretty serious upper respiratory infections" and one of the children was dehydrated. The children had not had much, if any, medical care prior to their removal, and three of the four children had not received any immunizations. Brittney had received some immunizations. The children were also diagnosed as being "developmentally behind and seriously neglected."

O'Brien testified that at the beginning of his involvement with the case, Bob would be "reasonably pleasant" to talk to at times; however, at other times, he would be mad and argue with O'Brien, causing him to have to communicate through Bob's attorney. O'Brien testified that Bob's refusal to talk to him delayed getting services in place. O'Brien also testified that Bob made subtle threats toward him, alleged that O'Brien wanted to adopt the children, and alleged that he was having an affair with the foster parent. O'Brien testified that during his involvement with the case, Bob's attitude toward the Department had not changed. He continued to argue with and yell at workers present in the home, which often would upset the children.

O'Brien testified that Bob made all the parenting decisions and that he did not want O'Brien talking to Veronica. He further testified that Veronica never went against what Bob said.

O'Brien testified that in July 2018, he located two guns in a vehicle on Bob and Veronica's property, as well as a gun in a gun case located in a closet inside the house. The gun in the closet was loaded and the safety was off. O'Brien also stated that in July 2018, there were numerous "junk vehicles" on the

- 495 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

property, a couple of them lifted up on blocks and one balanced on a cinder block. He testified that Bob believed that it was appropriate for the children to play in and around the vehicles and argued against removing the vehicles. On the property, there were also two refrigerators outside and a stack of wood with nails exposed. The basement of the home had standing water in it, and there were mice feces in the children's dresser drawers and in the kitchen cabinets. O'Brien testified that the condition of the property had been an issue since the case began, including a concern about allowing the children to play on and inside the vehicles.

O'Brien testified about three specific incidents involving the children and the vehicles in the yard. The first incident involved the children unattended and playing in one of the vehicles on a hot day. One of the caseworkers, at the home at the time, addressed it with the parties. The second incident occurred the next day, when Brittney was observed sleeping in one of the vehicles on a hot day. The third time, a worker observed the two boys playing in a van with the keys in the ignition while Bob was working on the van. Neither Bob nor Veronica thought it was wrong to leave the children in a vehicle on a hot day or that any of these instances were dangerous for the children.

O'Brien testified that he had not been to the property since July 2018 and that he had heard from others involved in the case that Bob had rectified some of the safety issues on the property since that time.

O'Brien indicated that he had not seen any improvement in Bob's ability to parent the children. He also stated that he had seen improvement in Veronica's ability to parent, in that she had been responsive to some services. However, he worried whether the improvement was sustainable due to her low cognitive level. O'Brien stated that the case plan goals have remained the same throughout the case and have not been met.

- 496 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

Breanna Bird was the caseworker from January to May 2018, during the time that O'Brien was not assigned to the case. Bird testified that Bob expressed his anger toward O'Brien and made accusations against the foster parents and the family support workers. He was inconsistent in following redirection from family support workers and would argue with them about their suggestions.

In regard to Veronica, Bird testified that she was good at attending to Brittney's needs, but struggled if she had to attend to the needs of more than two children. Bird stated that she did not see enough progress to recommend reunification of the children with the parents.

Lucinda Tanner, a pediatric physician assistant, examined the children on December 29, 2016, after their removal from the home, and saw them again on April 20, 2017. She testified that when she first examined Becka, she could not speak, she had no change in expression, and Tanner was unable to get her to engage in anything. Tanner opined that Becka was a victim of child neglect and medical neglect and that she presented as a traumatized child. Thomas and Robert both had notable speech delays and had not received immunizations. Tanner was concerned about the children because of their speech delays and their inability to communicate, which she found particularly concerning in regard to Becka, who was 5 years old, and Robert, who was 3 years old. She also opined that Becka, Robert, and Thomas were all neglected.

Tanner testified that when she saw the children in April 2017, after they had been out of the family home for 4 months, they were very different. Their communication skills had improved, they were more interactive, and there was a change in their demeanor. She was "[p]leasantly surprised" with the changes she observed.

The testimony of the initial foster mother, given at a previous hearing, was entered into evidence. She testified that when the children came to live with her in December 2016, Becka, Robert, and Thomas had respiratory infections and Thomas was

- 497 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

dehydrated. Becka, Robert, and Thomas communicated with each other using "their own language," which she described as them "us[ing] their vowel sounds but no consonant sounds." With everyone else, the children were nonverbal. They did not interact with the foster parents or the other children in the home, and they did not play with toys. The initial foster mother testified that Robert and Thomas would just sit on the floor and that Becka would pace back and forth. At mealtime, they would eat with their hands and did not know how to use eating utensils. They also did not know how to drink out of a cup. At bedtime, Becka, Robert, and Thomas would scream and throw tantrums.

The foster placement changed in June 2017, in part because of a telephone call involving the initial foster mother and Bob in which Bob was making demands, and also because Bob had learned where she lived and she was worried he would come to the house and disrupt things for his children and the other children in the home.

The children's new foster mother testified that when the children came to live with her in June 2017, Becka was almost 6 years old and she was unable to talk using words. The children would "grunt, screech, scream" to communicate with each other and "kind of had . . . their own language." They also barked like dogs. They were aggressive, threw tantrums, slobbered, and chewed on objects, such as the corner of a chair. The new foster mother also testified that they did not know how to use eating utensils or how to drink out of a cup without a lid. Becka would also defecate outside.

The new foster mother testified that at the time of trial, the children were "normal" children. She stated that they behave well and are respectful. They sit at the table to eat. Becka does chores and is "very proud" to have some responsibility. The new foster mother testified that she is able to handle all the children herself; their behaviors are not such that she needs help taking care of them.

- 498 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

The new foster mother testified that Bob's actions have made her concerned for her safety. She testified that although Bob has not threatened her verbally, he has "postured" to her, taken pictures of her vehicle, stared her down, and stood in front of the path where she was walking so she had to go around him. About a month before trial, Robert told her that Bob "was going to shoot [her]."

Dr. Gage Stermensky, a licensed clinical psychologist, performed an evaluation of Bob and Veronica in July 2017 to assess their parental capacity to meet the children's needs. Stermensky diagnosed Bob with paranoid personality disorder, with an indication of narcissistic traits. In his assessment, Stermensky found that Bob "struggles with accountability and is quick to blame others." He also "easily justifies his behavior through paranoid and cynical means," and has a "distrust and suspiciousness of others resulting in interpreting their actions as malevolent." Stermensky testified that Bob's paranoia interferes with his ability to work with State agencies and individuals trying to offer him assistance. His paranoia also affects his ability to meet the safety and welfare needs of his children, because those needs often involve community resources, such as schools and doctors, and Bob does not trust such resources. Stermensky concluded that Bob lacked "parental capacity abilities" at the time of the evaluation. He concluded at trial that long-term interventions would be necessary for Bob to parent and that he would need to find "more amicable and open ways to trust and work with . . . individuals for the best interest[s] of the children."

In regard to Veronica, Stermensky determined that her general cognitive ability is in the extremely low range; her verbal comprehension and perceptual reasoning are both in the borderline range; her ability to sustain attention, concentrate, and exert mental control is in the extremely low range; and her ability to process simple or routine visual material without making errors is in the low average range. Her cognitive limitations were severe enough to prevent her

- 499 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

from completing some activities associated with "normative living," such as employment and meeting daily living needs. Stermensky determined that Veronica met the diagnostic criteria for an intellectual disability. He opined that based on her cognitive and intellectual ability, she lacked the capacity to provide sufficient care for her children independently. He testified that someone with Veronica's diagnosis would have a problem being able to assess risk to their children and could "struggle in confidence and setting boundaries with others." He further testified that Veronica's "desperation for contact may motivate dependency on others and increase vulnerability through exploitation."

Lori Rodriquez-Fletcher, a child-parent psychotherapist, started therapeutic visits with the family in July 2017 and started individual therapy with Bob in October 2017. The therapeutic visits continued until June 2018. She testified that Bob had made some progress in therapy, but that he struggles implementing what he has learned when dealing with people outside her office. She testified that Bob continued to struggle with making accusations against other people, had paranoid thoughts, and had problems appropriately showing his frustration and stress.

Rodriquez-Fletcher testified that some family therapeutic sessions went well and that others were chaotic. She stated that at the last family session, she had to redirect Bob for confronting the foster father. At the same session, she had to call the foster parents to come get the children because Bob and Veronica could not control the children.

Rodriquez-Fletcher testified that Veronica genuinely wants to parent the children and did the best she could at the therapeutic visits, but she struggled because of her cognitive impairments which affect her ability to process things and act accordingly. She further stated that Veronica gets easily flustered and overwhelmed. Rodriquez-Fletcher was asked if Veronica was able to care for all five children by herself, and she indicated she was not.

- 500 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

Joan Schwan is a licensed independent mental health practitioner and also the clinical supervisor for an intensive family preservation program. Intensive family preservation workers provided services for this family for 11 weeks prior to trial and were in the home 4 to 12 hours each week. There was a therapist and a "skill builder" assigned to work with Bob and Veronica. Schwan testified that there had been little to no progress with the techniques the intensive family preservation workers were trying to implement with Bob. She stated that his personality disorder "blocks his insight and judgment into what's really going on," making it difficult for him to accept responsibility, to accept feedback without arguing, and to put his children's safety above his own need to be right.

In regard to Veronica, Schwan testified that she tried to implement the strategies the "skill builder" had asked her to do, but Bob would undermine her. Schwan testified that although Veronica had moved out of the family home a few weeks before trial, based on her dependency disorder, she was likely to allow either Bob back into her life or someone else who would meet her dependency needs. Schwan acknowledged that Veronica's moving out was a good step toward becoming independent, but that becoming independent and being able to parent the children were "two completely different things."

Schwan testified that Bob does not have the capacity to parent the children because nothing had been corrected in the past 1½ years. In regard to Veronica, she testified that the deficits that need to be corrected have not been. When Schwan was asked if reunification was achievable in the near future, she responded that because there had been no change in the parents' behavior in the past 1½ years, she did not believe anything would change in the future.

Amanda Walter is a co-owner of Optimal Family Preservation (OFP), a company that provided transportation and visitation supervision for the family. In addition to owning the business, Walter also supervises the family support

- 501 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

workers she employs, reviews all their reports, and attends team meetings with families. She testified that OFP started working with Bob, Veronica, and their children in September 2017 and did so up until the time of trial.

Walter testified that she has seen minimal progress by Bob during the time OFP has worked with the family. She stated that based on her review of the workers' reports, Bob is often on the telephone during visits, and he takes a nap during almost every visit, thereby preventing him from assisting with the children. She stated that the workers were still having to redirect both parents on a frequent basis and that there were safety concerns due to dangerous items outside and around the home, as well as Bob's failure to make sure the children are safe. Walter testified that Bob's aggressive behavior continued throughout OFP's involvement in the case. She testified that Bob sometimes argues with the workers when he is redirected or does not respond to redirection at all. Bob accused Walter's husband, who is a family support worker for OFP, of being a "drunk" and has accused other workers of destroying property and stealing property. She also testified that workers have felt unsafe because of Bob's "abrasive behavior," which would upset the children at times. Based on the reports of the workers, Bob's abrasiveness, paranoia, distrust, and accusatory statements had increased during the time OFP has worked with the family.

Walter testified that Veronica was nurturing and had a close bond with the children. She testified that Veronica had been open to suggestions and redirection. She tried hard to meet the children's needs and did well with the younger children. However, she struggled with disciplining and enforcing rules with the older children. Walter also testified that Bob overrides Veronica when she tries to implement discipline or rules. Walter further testified that it would be difficult for Veronica to parent all five children on a continual basis.

Walter's husband, who is a co-owner of OFP, had been a family support worker with the family since September 2017

- 502 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

and had been supervising visitations two times per week. He testified that when supervising visitation, he spent a lot of time watching for safety hazards. For example, he testified that Bob took three of the children with him on a one-seat tractor with no cab, and with a 6- to 8-foot sickle mower blade attached with no guard on it. He testified that this could not be safe for the three children. He told Bob it was irresponsible to take the children on the tractor, but he did not listen. Other safety concerns included a utility truck that was on the property, as well as a toy car that Bob put a 12-volt car battery in that was accessible to the children. Bob would also burn trash in the furnace in the basement. Walter's husband acknowledged that in the month before trial, there had been significant improvement in the safety concerns that were outside in the yard.

Walter's husband also testified that at the last visit before trial, Brittney had a fever and he told Bob to give her Tylenol, and Bob refused. Walter's husband ended the visit as a result. He further testified that recently, Bob instructed the workers that they cannot drive through a second gate on the property that leads to the house. This requires the workers to get the children out of the vehicle at a location farther from the house, where there is cow manure.

Walter's husband also testified that Bob takes a nap during nearly every visit and spends a large amount of time on the telephone, rather than spending time with his children. He testified that during these times, Veronica would be left to handle all five children herself, which was a struggle for her and would result in a family support worker helping her with the parenting.

He testified that Bob ignores his suggestions or redirection and that Veronica listens to the suggestions, but does not have the power to change anything. He testified that Bob will let Veronica discipline the children, but then he will undermine her decision and tell the children something else.

- 503 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

The court-appointed special advocate for the children in this case testified that she has been involved with the case since before the children were removed from the home. She testified that the children's speech, the way they play, and their socialization has greatly improved since she first started working with the children.

She testified that she had concerns for the safety of the children at the family home. She testified that she observed the children playing in the vehicles in the yard, as well as on a utility truck that the children would climb up and not be able to get back down. She also stated that on the property was an old freezer, batteries, a sickle mower blade, and a pile of wood and leaves close to the basement door which could attract rodents and snakes.

When the court-appointed special advocate was asked if she had seen changes in Bob and Veronica's parenting skills, she stated that there were times when it seemed Bob had changed, but then the next time she saw him, his behavior was the same as it was in the beginning. Such behavior included yelling, screaming, calling the workers names, and being on the telephone. She acknowledged that he had moved the vehicles off the property, but noted that it took him 19 months to do so. In regard to Veronica, she testified that Veronica does well with Brandy and Brittney, the youngest two children, but that she does not have much interaction with the three older children.

Bob testified that he had made some mistakes in regard to parenting the children, but that they were not all his fault. He implied that a support worker put a clip in the gun that was found in the closet. He did not believe that either incident when his children were in a hot vehicle was a dangerous situation, and he believed his children were safe when riding on the tractor. He also denied threatening any of the workers involved with the case.

Veronica testified that she moved out of the home she shared with Bob about 3 weeks before trial. She stated that

- 504 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

her relationship with Bob had been "great," but she moved out of the home "[f]or the children's sake." She further explained that she moved out in hopes of getting the children back and not having her parental rights terminated. Veronica did not have a job and relied on Bob for financial support during their relationship. Approximately 1 or 2 months before trial, she applied for Social Security disability benefits. She does not have a drivers' license. She most recently took the test in April 2018 to obtain a driver's license, but she did not pass.

Veronica admitted that she did not think she could handle caring for all five children by herself at the time of trial. Veronica believed that with the help of her family she could adequately care for the children. She had talked to her father about the possibility of her moving in with him in Wisconsin, along with the five children, and she said he was "open to it." She had not been to Wisconsin to visit family in at least 3 years.

Following trial, the court found that statutory grounds to terminate Bob's and Veronica's parental rights existed pursuant to § 43-292(2), (3), (5), (6), and (7) and that termination was in the children's best interests.

### III. ASSIGNMENTS OF ERROR

Bob assigns, restated, that the juvenile court erred in (1) admitting exhibit 361 into evidence because it violated his due process rights, as well as his right to cross-examine witnesses, and (2) finding that it was in the best interests of the children to terminate his parental rights.

Veronica cross-appealed, assigning, restated, that the juvenile court erred in (1) finding that the State presented clear and convincing evidence that statutory grounds for termination existed under § 43-292(2), (3), (5), (6), and (7); (2) finding that there was sufficient evidence to show that she was an unfit parent; and (3) finding that termination of her parental rights was in the best interests of the children.

- 505 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

## IV. STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016).

## V. ANALYSIS

### 1. Admission of Exhibit 361

Bob first assigns that the juvenile court erred in admitting exhibit 361 into evidence because it violated his due process rights, as well as his right to cross-examine witnesses. This exhibit is a compilation of notes and reports written by OFP family support workers who supervised visitations and observed the family. The exhibit was received into evidence over objection, under the business records exception to the hearsay rule. See Neb. Rev. Stat. § 27-803(5)(a) (Reissue 2016). It was admitted during the testimony of Walter, a co-owner of OFP, who testified that she oversees OFP's programs, reviews the reports submitted by the workers, files all documentation, and is the recordkeeper of the company. She testified that she compiled the reports contained in exhibit 361 and that the OFP documents are maintained in the ordinary course of its business.

[2,3] We note that the Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007). Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *Id.* In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost. *In re Interest of Destiny A. et al., supra*.

- 506 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

[4,5] Rather than the formal rules of evidence, we evaluate the admission of evidence in termination of parental rights cases using a due process analysis. *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003). Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *In re Interest of Rebecka P., supra*.

In the instant case, the record reflects that both Bob and Veronica received proper notice of the termination hearing and that during the termination hearing, both were represented by their respective counsel. Bob and Veronica were given a reasonable opportunity to refute or defend against the grounds alleged for termination of their parental rights and had a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence in regard to the termination. Although Bob contends that exhibit 361 contains reports from family support workers who did not testify at trial and that therefore, he could not cross-examine them, many of the OFP family support workers did testify, as well as Walter who supervised them all. Further, the reports of the family support workers who did not testify primarily contained more of the same information in regard to Bob's behavior, safety concerns, and lack of progress.

Having conducted a de novo review of the record, we find that the juvenile court employed fundamentally fair procedures during the proceedings and that exhibit 361 was properly considered by the juvenile court. As previously stated, the exhibit was admitted under the business records exception to the hearsay rules, and although the evidence rules do not apply in cases involving the termination of parental rights, there was sufficient foundation for admission of the exhibit

- 507 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

under the business records exception. We find no merit to
Bob's first assignment of error.

## 2. Termination of Bob's Parental Rights

[6] For a juvenile court to terminate parental rights under
§ 43-292, it must find that one or more of the statutory grounds
listed in this section have been satisfied and that such termina-
tion is in the child's best interests. *In re Interest of Kenna S.*,
17 Neb. App. 544, 766 N.W.2d 424 (2009). See *In re Interest
of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007). The State
must prove these facts by clear and convincing evidence. *In
re Interest of Kenna S., supra*. See *In re Interest of Xavier
H., supra*.

### (a) Statutory Grounds for Termination

The juvenile court found that the State had presented clear
and convincing evidence to satisfy § 43-292(2), (3), (5), (6),
and (7). Bob does not challenge the juvenile court's finding
that statutory grounds to terminate had been met. However,
because our review is de novo, we address this requirement for
termination of parental rights.

[7,8] Section 43-292(7) allows for termination when the
juvenile has been in an out-of-home placement for 15 or more
months of the most recent 22 months. It operates mechani-
cally and, unlike the other subsections of the statute, does not
require the State to adduce evidence of any specific fault on the
part of a parent. *In re Interest of Kenna S., supra*. In a case of
termination of parental rights based on § 43-292(7), the protec-
tion afforded the rights of the parent comes in the best interests
step of the analysis. *Id.*

Here, it is undisputed that the children have been in out-of-
home placement for 15 or more months of the most recent 22
months. The children were removed from Bob and Veronica's
home on December 16, 2016. The State filed its motion for
termination of parental rights on July 31, 2018, and the termi-
nation trial was held in August 2018. The children remained

- 508 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

out of the home since their removal in December 2016. At the time of trial, the children had been out of the home for 20 months. Thus, the statutory requirement for removal under § 43-292(7) has been met.

[9] If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Chloe C.*, 20 Neb. App. 787, 835 N.W.2d 758 (2013). Because the State presented clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Bob's parental rights exists.

### (b) Best Interests

[10-13] Bob assigns that the juvenile court erred in finding that it was in the children's best interests to terminate his parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

- 509 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

[14,15] The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

[16] In cases where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

This family first became involved with the Department in 2013, and it was again investigated in 2015 based on two intakes. Becka, Robert, and Thomas were subsequently adjudicated in the present case in February 2016, and Brandy in April 2017. Between February 2016 and the time of trial in August 2018, the Department has provided the family with numerous services in an effort to achieve case plan goals and keep the family together. However, there has been little to no change in Bob's behavior, attitude, and willingness to change. The record is replete with evidence that Bob has been uncooperative with the services offered and the people providing the services. He continued to argue with the workers, yell at them, intimidate them, and make subtle threats against them. He also made accusations against the service providers and the foster parents. When redirected by a worker, he either argued with the worker about the suggestion made or simply ignored the redirection. There was evidence that at the time of trial, the workers were still frequently trying to redirect Bob. He made the service providers feel unsafe, so much so that two of them obtained protection orders against him. There was evidence that there had been little to no progress with

- 510 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

the techniques OFP was trying to implement in the 11 weeks before trial.

Before the children were removed in December 2016, they received little medical care. They were not taken to the doctor, and three of the four children had no immunizations. When they were removed, Becka, Robert, and Thomas all had respiratory infections and Thomas was dehydrated. The children were also developmentally behind. Becka, who was 5 years old at the time of removal, could not talk, and the others had speech delays and had their own version of a language that they used to communicate with each other. They did not know how to use eating utensils or drink out of a cup without a lid. During their time in foster care, the children have made great progress. Tanner, a pediatric physician assistant, testified that after the children were out of the home for only 4 months, their communication skills had improved, they were more interactive, and she saw a change in their demeanor.

Throughout the case, there have been safety concerns. The vehicles and other items outside the house that were accessible to the children had always been an issue. Some of the vehicles had been moved at the time of trial, but as one witness pointed out, it took Bob 19 months to do so. Bob also took three of the children with him on a one-seat tractor with no cab, and with a sickle mower blade attached with no guard on it. Other safety concerns included the parents' letting the children play or sleep in one of the vehicles on a hot day. The second time this happened was after the caseworker had addressed the safety issue with the parents the day before. There was also evidence that three guns were located on the property the month before trial. Two were located in a vehicle, and the other was in a closet in the house and was loaded. The guns were located after the Department had been working with the family on safety and other issues for over 2 years. The evidence was clear that at the time of trial, Bob still did not recognize certain safety hazards.

- 511 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

[17] Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been no change in Bob's behavior over the course of the case, and based on his diagnosis of paranoid personality disorder, he was unlikely to change in the future. The case plan goals had remained the same throughout the case and had not been met, and there had been no improvement in Bob's ability to parent.

[18] Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Becka, Robert, Thomas, and Brandy have been in foster care since December 2016. They deserve stability in their lives and should not be suspended in foster care when Bob is unable or unwilling to rehabilitate himself. Accordingly, we find there was clear and convincing evidence to show that Bob was unfit and that terminating his parental rights was in the children's best interests.

### 3. Termination of Veronica's Parental Rights

As a preliminary matter, we note that Veronica failed to comply with the rules regarding cross-appeals. See Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2014). Bob was the only party to file a notice of appeal, and therefore, he was the appellant. However, pursuant to Neb. Ct. R. App. P. § 2-101(C) (rev. 2014), once a notice of appeal is filed, all other parties become appellees and can file a cross-appeal. Here, Veronica properly designated herself as an appellee and filed a "Brief of Appellee on Cross Appeal." As a cross-appellant, Veronica was required to comply with the rules on cross-appeals, including the requirement that she designate on the cover of her

- 512 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

brief that it is a cross-appeal, and set forth her cross-appeal in a separate division of the brief titled "Brief on Cross-Appeal." See § 2-109(D)(4). Veronica properly designated the cover of her brief as a cross-appeal, but she did not set forth her cross-appeal in a separate division of the brief. Other than the cover, she prepared her brief as though she was an appellant and not an appellee and cross-appellant. This court, in *In re Interest of Chloe P.*, 21 Neb. App. 456, 840 N.W.2d 549 (2013), declined to award the father any affirmative relief due to his failure to follow the foregoing briefing rule. In that case, the father correctly designated himself as an appellee on his brief. In his brief, he assigned errors and sought affirmative relief; however, there was no designation of a cross-appeal on the cover of his brief, nor was a cross-appeal set forth in a separate division of the brief as required by § 2-109(D)(4). We found the case to be governed by *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999), in which the Supreme Court declined to consider a father's arguments appealing the termination of his parental rights because he failed to properly designate his arguments as a cross-appeal. In its refusal to consider the father's assignments of error, the court explained that "the appellate courts of this state have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee," *id*. at 146, 602 N.W.2d at 451. The court further explained that appellate courts "have repeatedly indicated that a cross-appeal must be properly designated, pursuant to [§ 2-10]9(D)(4), if affirmative relief is to be obtained." *In re Interest of Natasha H. & Sierra H.*, 258 Neb. at 145, 602 N.W.2d at 450.

The instant case is partially distinguishable from *In re Interest of Chloe P., supra*, and *In re Interest of Natasha H. & Sierra H., supra*, in that Veronica properly designated the cover of her brief as a cross-appeal. However, her brief did not contain a separate section for the cross-appeal as also required by § 2-109(D)(4). Rather, her brief was generally prepared in

- 513 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

the form of an appellant's brief and did not separately respond to Robert's appellant's brief other than accepting his statement of the basis of jurisdiction and statement of the case. Although Veronica's brief violates the portion of the rule requiring a separate section for a cross-appeal, because the form and presentation of her assignments of error conform with the rules applicable to an appellant's brief, we may consider the arguments raised in her brief. See, *Knaub v. Knaub*, 245 Neb. 172, 512 N.W.2d 124 (1994); *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990).

Accordingly, we will consider Veronica's arguments on appeal.

### (a) Statutory Basis for Termination

Veronica assigns that the juvenile court erred in finding that the State presented clear and convincing evidence that statutory grounds for termination existed under § 43-292(2), (3), (5), (6), and (7). As discussed above, the children were in an out-of-home placement for 15 or more months of the most recent 22 months and, therefore, termination of Veronica's parental rights was proved under § 43-292(7).

### (b) Best Interests

Veronica next assigns that the juvenile court erred in finding that there was sufficient evidence to show that she was an unfit parent and that termination of her rights was in the best interests of the children. We disagree. As previously set forth in the best interests analysis in regard to Bob, the children had received little to no medical care before they were removed from the parental home. At the time of removal, the three oldest children had respiratory infections and Thomas was dehydrated. The children were also developmentally behind, especially in regard to verbal skills. Further, there had been numerous safety concerns throughout the case involving items on the property and the parents' ability to recognize these hazards.

- 514 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

Specific to Veronica, the evidence showed that her general cognitive ability is in the extremely low range. Her cognitive limitations were severe enough to prevent her from completing some activities associated with "normative living," such as employment and meeting daily living needs. Stermensky, a licensed clinical psychologist, determined that Veronica had an intellectual disability and lacked the capacity to provide sufficient care for her children by herself. Rodriquez-Fletcher, a child-parent psychotherapist, agreed that Veronica was unable to care for all her children by herself. She testified that although Veronica wants to parent the children and was doing the best she could when working with service providers, she would get flustered and overwhelmed. Family support workers would often have to step in and help with the parenting at times when Veronica was trying to handle the children by herself during visits.

Veronica was able to care for Brandy and Brittney's needs, but struggled if she had to attend to the needs of more than two children. Walters, a co-owner of OFP, testified that Veronica also struggled with disciplining and enforcing rules with the oldest three children. Walters testified that it would be difficult for Veronica to parent all five of her children on a continual basis. Further, Veronica admitted at trial that she did not believe she could care for all five children by herself.

The evidence also showed that Bob made all the parenting decisions and that Veronica would simply do what he said. If she tried to discipline or make a decision in regard to the children, Bob would undermine her. At the time of trial, Veronica had moved out of the family home and was no longer living with Bob because she thought it would help her get the children back. However, she had only moved out about 3 weeks before the termination trial. Further, there was evidence that based on her dependency on others, she was likely to allow Bob back into her life or find someone else to meet her dependency needs, which also made her vulnerable to exploitation.

- 515 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE INTEREST OF BECKA P. ET AL.
Cite as 27 Neb. App. 489

We find there was clear and convincing evidence to demonstrate that Veronica was unfit and that terminating her parental rights was in the children's best interests.

## VI. CONCLUSION

We conclude the court did not err in admitting exhibit 361 into evidence. We also conclude the State proved by clear and convincing evidence that grounds for termination of Bob's and Veronica's parental rights existed under § 43-292(7) and that termination of their parental rights is in the children's best interests. Accordingly, the juvenile court's order is affirmed.

Affirmed.