IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF CHARLEE W. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF CHARLEE W. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CHARLES W., APPELLANT.

Filed June 27, 2023.    No. A-22-862.

Appeal from the Separate Juvenile Court of Douglas County: CANDICE J. NOVAK, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Katherine M. Tupper for appellant.

Jackson Stokes, Deputy Douglas County Attorney, for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Charles W. appeals the termination of his parental rights to his three minor children. He contends that the Douglas County Separate Juvenile Court erred in terminating his parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and in finding that termination was in the minor children's best interests. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Charles is the natural father of Charlee W., born in April 2013; Camryn W., born in January 2015; and Chevee W., born in October 2018. The minor children's mother is not part of this appeal and will only be referenced as necessary for context.

On July 28, 2020, the State removed the children from the parents' home based upon allegations of domestic violence and substance use by the parents. That same date, the State filed an adjudication petition related to Charles. In September, Charles admitted to the allegations within the adjudication petition which asserted that his use of alcohol and/or controlled substances placed the minor children at risk for harm. All three children have remained in out-of-home placement during the entirety of these proceedings.

During the pendency of this case, the court ordered Charles to maintain safe and stable housing; maintain a stable and legal source of income and provide written verification to DHHS on a monthly basis; participate in supervised visitation while maintaining appropriate interactions and meeting the children's basic needs; participate in family support services; undergo random, frequent, observed drug testing; abstain from possessing or ingesting alcohol and/or controlled substances unless prescribed by a licensed, practicing physician; complete a co-occurring evaluation and comply with recommendations; complete a batterer's intervention program; and complete a parenting class.

Services offered to Charles included case management, family support services, agency-supervised visitation, urinalysis testing, co-occurring evaluation, batterer's intervention, individual therapy, parenting classes, and residential treatment. Services offered to the children included case management, kinship placement, Medicaid, kinship support, therapy, and agency supervised visits.

On May 4, 2022, the State filed a motion for termination of Charles' parental rights. The State sought termination of Charles' parental rights pursuant to § 43-292(2) (neglect); § 43-292(6) (reasonable efforts have failed to correct conditions leading to adjudication); and § 43-292(7) (out-of-home placement for 15 or more months of most recent 22 months); and alleged that termination was in the minor children's best interests.

### 2. TERMINATION HEARING

The termination hearing was held on October 20, 2022. At the time of the termination hearing, the minor children had continuously been in out-of-home placement for nearly 27 months. The State adduced testimony from Sarah Mingus, Charles' probation officer; Miranda Kellner, a child family service specialist with DHHS; and the minor children's foster mother. Testimony generally consisted of Charles' conduct while on probation, his conduct in relation to the court-ordered requirements, and evidence relating to the best interests of the children. We summarize that evidence below.

### (a) Charles' Conduct While on Probation

Mingus testified that she has been Charles' probation officer since October 2021 and that while on probation, Charles was required to, among other things: maintain full-time employment; notify probation prior to any change in address or employment; not possess or consume alcohol or illegal substances; complete a drug and alcohol evaluation and follow recommendations; submit to chemical testing; attend two AA meetings per week; successfully complete a cognitive behavioral program; and wear a continuous alcohol monitoring (CAM) bracelet.

According to Mingus, Charles was sanctioned by probation on three occasions. He was first sanctioned in April 2022 for being unsuccessfully discharged from ARCH, which is a halfway house that provides substance use programming and counseling. He was sanctioned twice in May 2022 for failing to report his employment change to probation within a reasonable time frame, for failing to report for office visits, and for a CAM violation. Mingus explained that a CAM violation occurs when there is confirmed alcohol use, tampering with the CAM monitor, or an obstruction between the CAM bracelet and the skin. Sanctions imposed included completing a behavioral intervention plan, completing a facilitated supervision group, a travel restriction, and completing intensive outpatient treatment and outpatient treatment. Mingus stated that Charles successfully completed both intensive outpatient treatment and outpatient treatment. Mingus also stated that, although Charles had not been incarcerated on new charges since October 2021, he was jailed for a brief period "for a time pay warrant."

### (b) Charles' Conduct Regarding
### Court-Ordered Requirements

A significant portion of the trial centered on Charles' conduct in relation to the court-ordered requirements during the pendency of the case.

#### (i) Safe and Stable Housing

Charles was ordered to maintain safe and stable housing. Kellner testified that there were times when she was unable to reach Charles and had to contact other parties to learn of his whereabouts. According to Kellner, in February 2021, Charles was temporarily living with a friend until he was incarcerated in April 2021. Following his release from jail, he again began living with another friend. Charles then resided at NOVA Treatment Community, a residential treatment facility, until October 2021 when he was "kicked out."

After NOVA, Charles resided at ARCH from October 2021 to March 2022. ARCH is a halfway house that provided substance use programming and counseling. Charles was unsuccessfully discharged from ARCH due to noncompliance with dormitory rules and lying to staff members about his possession of a cell phone. From April to September 2022, Charles resided at New Journeys, a transitional living program which provides substance abuse evaluation and treatment. He was discharged from New Journeys after he did not return for curfew. Thereafter, Charles stayed with his mother-in-law or friends, but did not obtain permanent housing.

In October 2022, approximately two weeks prior to the termination hearing, Charles first requested financial assistance from DHHS to lease an apartment. The family support worker attempted to help Charles obtain Section 8 housing or find other housing options, but because

Charles was unable to find housing in a specific area of Omaha, he refused to look elsewhere. Kellner ultimately concluded that Charles failed to comply with the court order to maintain safe and stable housing.

Mingus separately described Charles' compliance with the requirement to maintain housing as "inconsistent" because he was unsuccessfully discharged from multiple programs both before and after October 2021 and he had had not obtained permanent housing.

*(ii) Employment*

Charles was ordered to maintain a stable and legal source of income and provide written verification on a monthly basis. Mingus testified that Charles had not maintained employment for longer than "a couple months at a time" and acknowledged that, although Charles was able to obtain employment "pretty quickly," he struggled with maintaining employment.

More specifically, the evidence indicated that, in October 2021, Charles was employed at a sandwich shop but left because "he wasn't getting paid enough." Charles was then employed at "Spin Linen" from February to May or June 2022 after deciding that he "wanted to look for a different type of work." In September 2022, Charles was fired from an unidentified employer due to tardiness.

*(iii) Attendance at Visitation*

Charles was ordered to participate in supervised visitation while maintaining appropriate interactions and meeting the children's needs.

During the entirety of this case, Charles' visitation never progressed beyond supervised visits. And during the six months prior to the termination hearing, approximately 5 to 10 of Charles' visits out of a total of 24 visits had been cancelled. Other visits were canceled because Charles could not provide food for the minor children and at least one visit was canceled due to safety concerns when the visitation worker suspected that Charles was under the influence of a substance when he had difficulty keeping his balance, was squinting his eyes, was slurring his words, and began to fall asleep at the visit. Since August 2022, Charles' attendance, as well as his ability to provide for the children on visits, was decreasing.

The children's foster mother testified that when visits with Charles were cancelled, three-year-old Chevee would be "upset" and would sometimes cry. Seven-year-old Camryn's reactions to missed visits included crying, not eating his dinner, having more outbursts, or just being more agitated or upset. Sometimes those outbursts would be physical including "throwing toys to hitting walls to hitting his sisters." The evidence also established that Charlee began bed-wetting after visitations.

*(iv) Family Support Services*

Charles was ordered to participate in family support services. Kellner testified that, despite the fact that three different family support services providers had been engaged on Charles' behalf from as early as October 2020, Charles did not complete family support services with any of those referrals. However, Kellner acknowledged that Charles' current family support worker had requested updated goals for Charles because "they had gone through all of his goals."

*(v) Submit to Drug Testing and*
*Abstain From Drugs/Alcohol*

Charles was also ordered to complete random drug testing and abstain from drugs and alcohol. The evidence established that, in January 2021, Charles received his second charge of driving under the influence. Also in 2021, Charles missed several tests, tested positive for methamphetamine on two occasions, and missed two drug tests during the week of the termination hearing. Charles also missed other drug tests throughout the pendency of the case. Missed drug tests are considered to be presumptively positive. Mingus testified that, since October 2021, Charles had one CAM violation due to an obstruction between the bracelet and his skin.

*(vi) Evaluation and Recommended Treatment*

Charles was ordered to complete a co-occurring evaluation and participate in recommended treatment. Charles completed an evaluation which recommended that he attend a residential treatment facility. Prior to the termination hearing, Charles was admitted to, and unsuccessfully discharged from, three residential treatment programs: NOVA, ARCH, and New Journeys. However, Mingus testified that Charles successfully completed intensive outpatient treatment in May 2022 and also completed outpatient treatment.

*(vii) Batterer's Intervention Program*

Charles was also ordered to complete a batterer's intervention program. Kellner stated that Charles began the program in January 2022, but had missed several classes and had not completed the program.

*(viii) Parenting Class*

Charles was ordered to complete a parenting class and he complied with this requirement.

(c) Testimony Governing Best Interests

The foster mother testified that all three minor children were placed with her on July 23, 2021, but at the time of the termination hearing, only Charlee and Chevee remained in her care. Camryn was moved to a different foster home in August 2022 due to safety concerns arising from his behaviors including hitting and kicking his sisters.

According to the foster mother, 9-year-old Charlee had "a lot of anger during school, so they have a seat in the back of the room for her to . . . calm down." Three-year-old Chevee was meeting her developmental milestones. Finally, the foster mother testified that, although Camryn was in a different placement at the time of the termination hearing, when he was with her, he had modifications at school due to behavior issues including having a place where he could go to calm down. Chevee experiences night terrors.

Although all three children started therapy in August 2021, Charles never attended the children's medical or dental appointments and never requested information regarding the children's medical needs or their therapy. Further, the foster mother testified that Charles sent gifts for the children but did not send money or clothes for them.

Kellner testified that she has been the caseworker for the minor children from February 2021 until the termination hearing, except for an approximately two-month gap in May and June 2021. Unlike the foster mother's testimony, Kellner testified that there was no bond between Charles and his children "at this time." She also testified that the factors she considers when forming an opinion as to whether termination of parental rights is appropriate in any given case includes the length of time the children have been in foster care, the parent's efforts to mitigate the risk that brought the children into the care of DHHS, if visits are liberalized or progressed to a different level of visitation, the consistency of the parent's visitation, the parent's compliance with court orders, the parent's demonstrated consistency and stability, the parent's elimination of any safety threats, and the best interests of the child or children.

Kellner opined that Charles was not fit to parent the minor children due to the length of the time that the children have been in foster care and his noncompliance with court orders including lack of housing and stable income. She further testified that it was her opinion that termination of Charles' parental rights was in the minor children's best interests due to the length of time that the minor children have been in foster care, Charles' lack of stability and consistency in complying with court orders, his sporadic attendance at visitation, and the fact that his visitation has not been increased or moved toward unsupervised visits.

### 3. COURT ORDER

In May 2022, the juvenile court found that the State had provided clear and convincing evidence that the minor children were children within the meaning of § 43-292(2), (6), and (7) and that termination was in the minor children's best interests. Charles has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Charles contends that the juvenile court erred in terminating his parental rights pursuant to § 43-292(2), (6), and (7) and in finding that termination was in the minor children's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. STATUTORY BASIS FOR TERMINATION

Charles contends that the juvenile court erred in terminating his parental rights pursuant to § 43-292(2), (6), and (7).

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is

in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The State must prove these facts by clear and convincing evidence. *Id.*

Section 43-292(7) grants termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This subsection operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra.*

Here, the minor children have been in out-of-home placement since July 28, 2020. At the time of the May 4, 2022, filing of the motion for termination of Charles' parental rights, the minor children had been in out-of-home placement for 21 consecutive months. And on the date of the October 20, termination hearing, the minor children had been in out-of-home placement for nearly 27 consecutive months.

Because we find that there was clear and convincing evidence that the minor children remained in out-of-home care for 15 or more months out of the most recent 22 months, we need not consider whether termination was proper based on the remaining statutory grounds. If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al., supra.*

## 2. BEST INTERESTS

Charles next argues that the juvenile court erred in finding that termination of his parental rights was in the minor children's best interests.

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015); *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *In re Interest of Jahon S., supra.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interest analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.*

Here, the evidence established that, during the 27 months that the minor children were in out-of-home placement, Charles has never obtained housing in his own name and was either incarcerated, lived with friends or relatives, or resided in treatment facilities or halfway houses.

Although Charles could find employment, he had difficulty maintaining employment and thus, did not establish a reliable income to support his children. He tested positive, or missed, numerous drug tests over the course of this case, and he failed to complete a batterer's intervention program. Further, although the foster mother testified that Charles shared a bond with the minor children, during the pendency of this case, Charles missed visits which negatively affected the minor children and he never progressed beyond supervised visits with the minor children.

Charles attempts to equate this case with *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005), while arguing that the State failed to adduce evidence focusing on the children's condition in the best interests analysis, as opposed to focusing solely on his conduct. In *In re Interest of Aaron D.*, the Nebraska Supreme Court reviewed a termination of parental rights grounded in relation to termination grounded solely in § 43-292(7). In contrast, here, the juvenile court determined that, in addition to § 43-292(7), termination was also proper pursuant to subsections (2) and (6). And it was the evidence submitted in support of termination under subsections (2) and (6) that informs our best interests analysis here.

Contrary to Charles' assertions, the evidence adduced by the State demonstrated the profound impact Charles' conduct had on his children and established a clear and convincing case of neglect and failure to provide for them. The evidence included, but was not limited to, Kellner's testimony of Charles' current lack of a bond with his children due to Charles' inconsistent participation in their lives; Charles' failure to attend or cancellation of multiple visits which, according to the foster mother, resulted in a measurable negative impact on the children's conduct and well-being; and, most notably, Kellner described how Charles' continuous neglect presented a risk of harm to the children which neglect included his lack of stable income, lack of housing, drug use, and his failure to place himself in a position to parent the children. We note that although the minor children have not yet experienced physical harm, "a court need not await certain disaster to come into fruition before taking protective steps in the interest of a minor child." *In re Interest of Chloe L. and Ethan L.*, 14 Neb. App. 663, 674, 712 N.W.2d 289, 298 (2006). Stated simply, despite Charles' professed love for his children, during the nearly 27 months that his children have been in out-of-home placement and the many services provided to him, he is no closer to being in a position to parent them than he was at the start of this case.

Charles is currently an unfit parent and there is no indication that this will change in the foreseeable future. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Accordingly, we hold that the juvenile court did not err in finding that termination of Charles' parental rights was in the minor children's best interests.

## VI. CONCLUSION

Having found that the evidence was sufficient to support the statutory basis for termination pursuant to § 43-292(7) and that termination was in the minor children's best interests, we affirm the juvenile court's order terminating Charles' parental rights.

AFFIRMED.