IN RE INTEREST OF REBECKA P., A CHILD
UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
LARRY P., APPELLANT.
669 N.W.2d 658

Filed October 10, 2003.   No. S-02-1353.

John H. Sohl, of Edstrom, Bromm, Lindahl, Sohl & Freeman-Caddy, and Gregory A. Brigham, Senior Certified Law Student, for appellant.

C. Jo Petersen, Deputy Butler County Attorney, for appellee.

Julie L. Reiter, of Mills & Reiter, guardian ad litem for Rebecka P.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

## NATURE OF CASE

On October 25, 2002, the Butler County Court, sitting as a juvenile court, entered an order terminating the parental rights of Larry P. to his minor daughter, Rebecka P., pursuant to Neb. Rev. Stat. § 43-292(2), (5), (6), and (7) (Reissue 1998). Larry appeals the termination of his parental rights. We reverse the judgment and remand the cause for further proceedings.

## STATEMENT OF FACTS

Larry is the natural father of Rebecka, born October 28, 1997. On August 29, 2001, Rebecka's biological mother, Marie H., voluntarily relinquished her parental rights to Rebecka, and Marie is not a party to these appellate proceedings.

On July 6, 2000, Rebecka was in the physical custody of Marie when she was removed from Marie's custody and placed in protective custody with the Nebraska Department of Health and Human Services (DHHS) due to allegations including neglect and lack of proper parental care. From November 1 to December 22, Rebecka was briefly returned to Marie's custody. On December 22, 2000, she was again removed from Marie's custody, and she has remained in foster care in the custody of DHHS since that date. During the pendency of these proceedings, Rebecka has never been in Larry's custody. The record suggests, however, that at the time these proceedings were initiated, Larry may have been in the process of seeking custody of Rebecka in separate proceedings.

On July 6, 2000, a petition was filed alleging that Rebecka was a juvenile as described under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1998). Larry was named as Rebecka's father in the petition and was advised of his rights pursuant to Neb. Rev. Stat. § 43-279.01 (Reissue 1998). An adjudication hearing was held on

September 13. In the court's September 13 order, Rebecka was adjudicated to be a juvenile within the meaning of § 43-247(3)(a). Larry did not appeal the adjudication order.

A hearing was held on October 5, 2000, and a disposition order was entered on October 11, setting forth a rehabilitation plan for Marie. The permanency objective was reunification of Rebecka with Marie. The first rehabilitation plan did not set forth a rehabilitation plan for Larry. Subsequent disposition hearings were held on January 24 and August 8, 2001. The case plans reviewed and approved by the court at these hearings were similar to the original case plan, but also included a rehabilitation plan for Larry, setting forth two goals. First, Larry was to appropriately parent Rebecka by participating in parenting classes and setting rules and consequences for Rebecka. Second, Larry was to appropriately supervise Rebecka by attending scheduled visits, demonstrating awareness of Rebecka and her activities during visits, and ensuring that Rebecka was safe during visits. The court also ordered Larry to obtain a psychological evaluation. Larry did not appeal the disposition orders establishing the rehabilitation plan.

On March 31, 2001, Larry was evaluated by Stephen Skulsky, Ph.D., a licensed clinical psychologist. The evaluation included a series of tests and a personal interview. In Skulsky's report issued following the evaluation, he noted that Larry possessed several "potential personality strengths," including "practical common sense," "good reality testing," "a strong interest in inter-personal relationships," and "some good underlying empathic capacities." Skulsky also noted some areas of concern, including Larry's suffering from depression and possessing a low frustration tolerance. Skulsky recommended that Larry undergo psychotherapy, as well as participate in a course of group work with other parents learning to become more effective as parents.

On May 2, 2001, a petition was filed to terminate Marie's parental rights to Rebecka. On August 29, Marie voluntarily relinquished her parental rights, and an order was entered the same day terminating her parental rights to Rebecka.

On October 3, 2001, a disposition hearing was held, and a new case plan involving Larry was approved by the court. Although Rebecka remained in foster care, the permanency objective was

reunification. Larry was given increased weekly supervised visits with Rebecka. This case plan continued the original goals set for Larry and spelled out a number of new goals for him, including providing appropriate shelter, food, and clothing for Rebecka during visitation, properly caring for Rebecka's hygiene, and participating in psychological counseling. Larry did not appeal this dispositional order.

On October 10, 2001, Skulsky evaluated Larry and Rebecka for the purpose of a bonding assessment "to determine if Rebecka and Larry have a substantial paternal bond." Skulsky's evaluation was based upon an interview he conducted with Larry and Rebecka, as well as upon his review of a September 25 court report prepared by DHHS containing observations of Larry's visits with Rebecka. In Skulsky's report prepared after this evaluation, he noted the following:

> During this evaluation it became quite clear that [Larry] could interact very well and appropriately with Rebecka. During the evaluation he sat on a chair as she played on the floor. He seemed to know her preferences in play. He seemed to be able to direct himself to interact with her in a very appropriate way and show her new toys and ways to see things.

> [Larry] was able to describe how he should handle discipline. He was able to describe ways that he needed to be affectionate with his daughter that he also showed in this interactional evaluation. [Larry] knew favorite foods, favorite activities, favorite TV shows and movies, who the best friend was, how his daughter played with the pets in the home. He therefore had a very good knowledge of her preferences.

> [Larry] was able to be loving and affectionate with Rebecka. During this evaluation he could talk about the appropriate things to do with her. She was quite a delightful child in many ways in the interactions with her father and the examiner.

As to the nature of Larry's relationship with Rebecka, Skulsky stated the following:

> The examiner in this bonding assessment was charged with establishing whether or not [Larry] was bonded

strongly to his daughter. He has bonded strongly to her. His daughter seems emotionally connected to, and caring of, him. It would hurt her somewhat if this bond were broken and she was not placed with him.

A permanency hearing was held on January 16, 2002. In a report prepared by DHHS, dated November 29, 2001, and received into evidence by the court, DHHS outlined certain of the services being provided to Larry by family support workers, including assistance with budgeting, guidance in menu preparation, and instruction in a nurturing program, in which Larry would work on setting rules, consequences, and boundaries for Rebecka. The report noted that "Rebecka has a very close relationship with Larry. They spend a lot of time together and have a lot of interaction." The report also stated that

> Larry continues to provide Rebecka with a lot of love and nurturance during their visits. Larry's interactions with Rebecka are appropriate most of the time . . . .
>
> . . . .
>
> Larry continues to work on the nurturing program with the family support worker and his visitations have been increased to allow him the full responsibility of parenting Rebecka.

The report also stated, however, that Larry was "struggling financially" and did not "understand the amount of attention and limits and boundaries Rebecka need[ed] in order to be safe in her environment."

The court continued the permanency hearing and ordered DHHS to prepare a permanency plan for Rebecka. At the continued hearing held on March 6, 2002, the court received into evidence a February 20 report prepared by DHHS that recommended that the permanency objective of reunification be changed to adoption, with the termination of Larry's parental rights. At this point, with the exception of November and December 2000, Rebecka had continuously been in out-of-home placement since July 2000.

The February 20, 2002, report indicated that Larry was making "[p]oor progress" to alleviate the necessity for out-of-home placement and that there were "no compelling reasons to continu[e] work toward reunification. Rebecka needs to be able to

have a permanent situation which the current foster parents are able to provide." The report supported this conclusion by noting that Larry continued to struggle with providing appropriate supervision for Rebecka during visitation, was unable to understand the amount of attention and limits Rebecka needed, continued to have financial difficulties, and had failed to complete assignments relating to the nurturing program. In an order filed March 6, 2002, the court approved the February 20 report and its permanency plan of adoption for Rebecka.

On April 2, 2002, the State filed a petition for termination of Larry's parental rights to Rebecka, which petition was amended on May 1. The petition, as amended, sought termination of Larry's parental rights under § 43-292(2), (3), (5), (6), and (7). The amended motion also asserted that termination of parental rights was in Rebecka's best interests.

Section 43-292(2) requires a finding that the parent has substantially and continuously or repeatedly neglected or refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. Section 43-292(3) requires a finding that the parent, being financially able, has

willfully neglected to provide the juvenile with the necessary subsistence, education, or other care necessary for his or her health, morals, or welfare or ha[s] neglected to pay for such subsistence, education, or other care when legal custody of the juvenile is lodged with others and such payment ordered by the court.

Section 43-292(5) requires a finding that the parent is unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period. Section 43-292(6) requires a finding that following a determination that the juvenile is one as described in § 43-247(3)(a), reasonable efforts to preserve and unify the family under the direction of the court have failed to correct the conditions leading to the determination. Section 43-292(7) requires a finding that the juvenile has been in out-of-home placement for 15 or more of the most recent 22 months.

On July 8 and 9 and continuing on September 12, 2002, the State's petition for termination came on for hearing. Larry was

present and represented by counsel. A total of six witnesses testified, and documentary evidence was received.

Skulsky's deposition was admitted into evidence over Larry's objection as to its reliability based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Skulsky's deposition included copies of his two written evaluations. Skulsky's deposition testimony essentially repeated the findings and conclusions included in his evaluations.

Several witnesses testified on behalf of the State, including Rebecka's DHHS caseworkers and certain family support workers. During the course of the trial proceedings, Larry filed a motion to quash and a plea in abatement, challenging the constitutionality of § 43-292(7) and Neb. Rev. Stat. § 43-292.02(1)(a) (Reissue 1998). Following a hearing, in a journal entry and order filed May 13, 2002, the court rejected Larry's challenge to the constitutionality of these statutes.

In a written order filed October 25, 2002, the court found that the State had proved by clear and convincing evidence the grounds for termination set forth in § 43-292(2), (5), (6), and (7). The court further found that it was in Rebecka's best interests that Larry's parental rights be terminated. Accordingly, the court terminated Larry's parental rights to Rebecka. Larry appeals.

## ASSIGNMENTS OF ERROR

On appeal, Larry asserts four assignments of error which we restate as three. Larry claims, renumbered and restated, that the trial court erred (1) in overruling his constitutional challenges to §§ 43-292(7) and 43-292.02(1)(a); (2) in overruling Larry's foundation objection to the testimony of Skulsky, which objection was based upon the standards set forth in *Daubert, supra*; and (3) in finding that the State had presented sufficient evidence to terminate Larry's parental rights.

## STANDARDS OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Joshua R. et al.*, 265 Neb. 374, 657 N.W.2d 209 (2003); *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003). When the evidence is in conflict, however, an appellate court may give weight

to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.* Before parental rights may be terminated, the evidence must clearly and convincingly establish the existence of one or more of the statutory grounds permitting termination and that termination is in the juvenile's best interests. *In re Interest of Joshua R. et al., supra.*

## ANALYSIS

*Constitutionality of Statutes.*

For his first assignment of error, Larry asserts that the court erred by overruling his plea in abatement to the effect that §§ 43-292(7) and 43-292.02(1)(a) are unconstitutional. We do not reach this issue. The rules of the Nebraska Supreme Court impose a specific notice requirement on parties seeking to challenge the constitutionality of a statute on appeal. Specifically, Neb. Ct. R. of Prac. 9E (rev. 2000) provides, inter alia: "Cases Involving Constitutional Questions. A party presenting a case involving the federal or state constitutionality of a statute must file and serve a separate written notice thereof with the Supreme Court Clerk at the time of filing such party's brief."

■ We have previously stated that "strict compliance" with the provisions of rule 9E is required in order for an appellate court to consider a challenge to the constitutionality of a statute. See, *Mid City Bank v. Douglas Cty. Bd. of Equal.*, 260 Neb. 282, 616 N.W.2d 341 (2000); *In re Application of SID No. 384*, 259 Neb. 351, 609 N.W.2d 679 (2000); *Zoucha v. Henn*, 258 Neb. 611, 604 N.W.2d 828 (2000); *State v. Feiling*, 255 Neb. 427, 585 N.W.2d 456 (1998). See, also, *State v. Campbell*, 260 Neb. 1021, 1028, 620 N.W.2d 750, 756 (2001) (stating "court will not consider claim that statute is unconstitutional when party failed to file notice required by rule 9E").

In the instant case, Larry did not file a written notice in compliance with rule 9E. Since the record in this case contains no separate written notice, we do not consider Larry's assignment of error to the effect that the court erred in failing to hold §§ 43-292(7) and 43-292.02(a)(1) unconstitutional.

*Admission of Skulsky's Testimony.*

For his second assignment of error, Larry claims that Skulsky's testimony, introduced at the termination hearing through his

deposition and attachments thereto, fails to satisfy the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), for the evaluation of expert testimony, and therefore, such testimony should have been excluded. We conclude that Larry's reliance on *Daubert* in the context of an appeal from the proceedings of a termination of parental rights hearing at which the rules of evidence are not required, is misplaced. We further determine that the introduction of Skulsky's testimony did not violate Larry's due process rights. Accordingly, we conclude this assignment of error is without merit.

In *Daubert*, the U.S. Supreme Court held that the "general acceptance" test for the admissibility of testimony about scientific evidence as set out in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), had been superseded by the adoption of the Federal Rules of Evidence. *Daubert, supra.* The Supreme Court rejected the *Frye* test and redefined the standards for the admission of expert testimony in the federal courts in the context of the Federal Rules of Evidence. *Id.* Those standards require proof of the scientific validity of principles and methodology utilized by an expert in arriving at an opinion in order to establish the evidentiary relevance and the reliability of that opinion. *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

We note that Nebraska's rules of evidence governing expert testimony are "essentially identical" to the Federal Rules of Evidence. *Phillips v. Industrial Machine*, 257 Neb. 256, 268, 597 N.W.2d 377, 385 (1999) (Gerrard, J., concurring). Compare Fed. R. Evid. 701 through 706, with Neb. Rev. Stat. §§ 27-701 through 27-706 (Reissue 1995). In *Schafersman, supra*, this court adopted the *Daubert* standards for the determination of the admissibility of expert testimony for trials in Nebraska state courts commencing on or after October 1, 2001. We specifically limited our ruling to those cases where the question was "the admissibility of expert opinion testimony under the Nebraska rules of evidence." *Id.* at 232, 631 N.W.2d at 876.

We have previously recognized that the Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999); *In re Interest of Constance*

*G.*, 254 Neb. 96, 575 N.W.2d 133 (1998). See, also, Neb. Rev. Stat. § 43-283 (Reissue 1998) (stating that "[s]trict rules of evidence shall not be applied at any dispositional hearing"). Instead, we have stated that due process controls and requires that fundamentally fair procedures be used by the State in an attempt to prove that a parent's rights to his or her child should be terminated. *In re Interest of Natasha H. & Sierra H., supra; In re Interest of Constance G., supra.* Because the application of the *Daubert* standards in Nebraska state court cases is limited to those cases in which the Nebraska rules of evidence apply, and the Nebraska rules of evidence are not applied in cases involving the termination of parental rights, we conclude the *Daubert* standards do not apply to cases involving the termination of parental rights. Compare *Mulroy v. Becton Dickinson Co.*, 48 Conn. App. 774, 712 A.2d 436 (1998) (stating *Daubert* standards inapplicable in workers' compensation case where workers' compensation commissioner is not bound by rules of evidence); *Armstrong v. City of Wichita*, 21 Kan. App. 2d 750, 907 P.2d 923 (1995) (declining to apply *Daubert* standards in workers' compensation case because workers' compensation board is not bound by technical rules of procedure).

Rather than the formal rules of evidence, we evaluate the admission of evidence in termination of parental rights cases using a due process analysis. We have recently addressed a parent's due process rights during termination proceedings. In *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 158, 655 N.W.2d 672, 681 (2003), we stated: " '[S]tate intervention to terminate the parent-child relationship must be accomplished by procedures meeting the requisites of the Due Process Clause.' " (Quoting with approval *In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 598 N.W.2d 729 (1999).)

We also recognized:

> "Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is

required by the Constitution or statutes; and a hearing before an impartial decisionmaker."

*In re Interest of Ty M. & Devon M.*, 265 Neb. at 158, 655 N.W.2d at 681 (quoting *In re Interest of Kelley D. & Heather D.*, 256 Neb. 465, 590 N.W.2d 392 (1999)).

In the instant case, the record reflects that Larry received proper notice of the termination hearing and that during the termination hearing, Larry appeared and was represented by counsel. With regard to Skulsky's testimony, the record reflects that Larry's counsel cross-examined Skulsky on Larry's behalf, and raised several objections to the testimony, including an objection going to the reliability of Skulsky's testimony. The record further reflects that the court considered these objections and issued a written order. Based on this record, we conclude that Larry was afforded due process in general and specifically with respect to the receipt of Skulsky's testimony. See *In re Interest of Ty M. & Devon M., supra.*

■ Because the Nebraska rules of evidence do not apply in cases involving the termination of parental rights, the *Daubert* standards, the application of which is limited to those cases in which the Nebraska rules of evidence apply, are not applicable in parental rights termination cases. The admission of Skulsky's testimony is evaluated under a due process analysis, and the record reflects that Larry's due process rights were not violated by the admission of Skulsky's testimony. Accordingly, Larry's assignment of error surrounding the admission of Skulsky's testimony is without merit.

*Termination of Parental Rights and Best Interests.*

The court found that the State established grounds for termination under § 43-292(2), (5) (6), and (7). The court did not address the State's allegation that Larry's parental rights should be terminated pursuant to § 43-292(3). Larry asserts that the court erred when it determined that the State had presented sufficient evidence to terminate his parental rights. We agree and determine that on this record, the best interests of Rebecka are not served by terminating Larry's parental rights at this time.

■ We have previously recognized that "[t]he foremost purpose and objective of the Nebraska Juvenile Code is the

protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parents where the continuation of such parental relationship is proper under the law." *In re Interest of L.H. et al.*, 241 Neb. 232, 245, 487 N.W.2d 279, 289 (1992). The law is clear that in a termination of parental rights case, the State must prove by clear and convincing evidence that termination is in the best interests of the child. *In re Interest of Joshua R. et al.*, 265 Neb. 374, 657 N.W.2d 209 (2003). To determine the child's best interests, the court must look at the evidence and assess the weight to be given that evidence. *In re Interest of John T.*, 4 Neb. App. 79, 538 N.W.2d 761 (1995).

The record in this case reflects that Larry and Rebecka have a loving father-daughter relationship. The caseworkers who have observed Larry's visitations with Rebecka note that Larry interacts frequently and appropriately with Rebecka. Skulsky's testimony was to the same effect. The record contains numerous references to Larry's playing with Rebecka, instructing her in a variety of activities, and conversing with her in an age appropriate manner. The record also indicates that Larry has made progress on providing balanced meals for Rebecka and caring for her hygiene needs. Although Larry has continued to struggle with supervision and discipline issues, there is evidence that he has made some improvement in these areas. While the caseworkers have expressed some concern that Larry is not always awake when Rebecka arrives in the mornings for visits, we note that on at least one such occasion, Larry had been up until 3 o'clock in the morning baking a birthday cake for Rebecka.

We acknowledge that the record reflects that Larry has not yet accomplished all of the goals set forth in the rehabilitation plans. We note, however, that the record indicates that he has progressed and can demonstrate some sound parenting techniques. In this regard, we are aware that the initial goal of the rehabilitation plan was reunification of Rebecka with Marie without regard to Larry and that this goal was abandoned after Marie relinquished her parental rights. After the initial plan, Larry became subject to a plan. Larry then became subject to a plan with the objective of reunification in October 2001. However, the goals of the plans including Larry changed from reunification to adoption

in about 5 months. The record suggests that Larry's opportunities for compliance may have been limited. For example, although Skulsky expressed reservations with regard to the potential for Larry's psychological development, the record is unclear whether Larry received the individual psychotherapy recommended in Skulsky's report and outlined in the rehabilitation plan. Finally, we note that a strong bond has developed between Larry and Rebecka, and we are mindful of Skulsky's conclusion that Rebecka will be hurt if that bond is severed.

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Joshua R. et al.,* 265 Neb. 374, 657 N.W.2d 209 (2003). Under our de novo review, and on the record presented, we conclude that regardless of the asserted statutory basis for termination, the State has failed to prove by clear and convincing evidence that Rebecka's best interests are served by terminating Larry's parental rights at this time.

## CONCLUSION

Based upon our de novo review of the record, we conclude there is not clear and convincing evidence that the termination of Larry's parental rights to Rebecka is in Rebecka's best interests. Accordingly, the judgment of the county court terminating such rights is reversed, and the cause is remanded for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.