Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/10/2020 09:06 AM CDT

- 95 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

In re Interest of Leyton C. and Landyn C.,
children under 18 years of age.
State of Nebraska, appellee,
v. Madison C., appellant.

___ N.W.2d ___

Filed March 3, 2020.    No. A-19-423.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.
2. **Parental Rights.** The foremost purpose and objective of the Nebraska Juvenile Code is the protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parents where the continuation of such parental relationship is proper under the law.
3. **Minors: Evidence.** To determine the child's best interests, the court must look at the evidence and assess the weight to be given that evidence.
4. **Parental Rights.** Children cannot, and should not, be allowed to linger in foster care while waiting to see if the parent will mature.
5. **Constitutional Law: Parental Rights.** Whether termination of parental rights is in a child's best interests is not simply a determination that one environment or set of circumstances is superior to another, but it is instead subject to the overriding recognition that the relationship between parent and child is constitutionally protected.
6. **Parental Rights: Parent and Child.** In determining whether it is in a child's best interests for the court to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between the parent and child.
7. **Parental Rights.** Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights.

- 96 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

8. **Parental Rights: Evidence.** When determining whether parental rights should be terminated, it is proper to consider relevant evidence of facts that have transpired since the date of the filing of a termination petition, including parental efforts and behavior.

Appeal from the Separate Juvenile Court of Lancaster County: Linda S. Porter, Judge. Reversed and remanded for further proceedings.

Melanie A. Kirk, of Johnson, Flodman, Guenzel & Widger, for appellant.

Patrick F. Condon, Lancaster County Attorney, Maureen Lamski, and Thomas Gage, Senior Certified Law Student, for appellee.

Joy Shiffermiller, of Shiffermiller Law Office, P.C., L.L.O., guardian ad litem.

Pirtle, Riedmann, and Welch, Judges.

Riedmann, Judge.

## INTRODUCTION

Madison C. appeals the order of the separate juvenile court of Lancaster County which terminated her parental rights to her minor children, Leyton C. and Landyn C. Upon our de novo review of the specific facts contained within the record, we find that the State failed to prove by clear and convincing evidence that terminating Madison's parental rights was in the best interests of the children. We therefore reverse the decision of the juvenile court and remand the cause for further proceedings.

## BACKGROUND

Madison, who was born in 1997, is the mother of Leyton, born in August 2015, and Landyn, born in February 2017. The father of the children has relinquished his parental rights; therefore, we do not address him in this appeal.

- 97 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

On July 19, 2016, the State filed a petition alleging that Leyton was a juvenile as defined by Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015). The petition specifically alleged that Leyton lacked proper parental care by reason of the fault or habits of Madison in that between November 4 and 24, 2015, Madison left him in the care of her mother without making proper provisions for his care; on or about June 8, 2016, Madison tested positive for methamphetamine; and Madison had failed to consistently provide a safe and stable home for Leyton. Upon Madison's admission to the allegations in the petition, the juvenile court adjudicated Leyton under § 43-247(3)(a). Leyton was allowed to remain at his maternal grandparents' home where he and Madison had been living.

In a subsequent order, the juvenile court, among other things, prohibited contact between Leyton and Madison's then-boyfriend, Jaden R., due to Jaden's criminal history. In March 2017, the court approved a placement change, removing Leyton from his grandparents' home and placing him with Madison's sister, after Madison and her mother gave Jaden a ride to his sister's home while Leyton was in the car. After Landyn was born, he was adjudicated under § 43-247(3)(a) (Reissue 2016) and was placed in a nonrelative foster home. In July, Leyton was moved to the foster home providing care for Landyn.

Madison moved into her own apartment in the fall of 2017, and the children were placed back with her in January 2018. They were removed again, however, in July, and placed back in their previous foster home. On October 11, the State filed a motion to terminate Madison's parental rights to Leyton and Landyn. The motion alleged that termination was appropriate under Neb. Rev. Stat. § 43-292(2), (4), and (6) (Reissue 2016) for both children and under § 43-292(7) with respect to Leyton. The motion also alleged that termination of Madison's parental rights was in the best interests of the children.

A hearing on the termination motion was held on December 14, 2018; January 3, 9, 25, and 29, 2019; and February 5, 8,

- 98 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

and 26, 2019. The evidence revealed that Madison was 18 years old and living with her parents when Leyton was born. When Leyton was approximately 1 month old, Madison began a relationship with Jaden. Jaden quickly became controlling, preventing her from contacting her family and encouraging her to stay with him. By January 2016, the emotional and mental abuse escalated, and Jaden began physically abusing Madison. By this time, he had taken her cell phone, and she had to "be good" in order to earn the chance to see Leyton and her family. Madison testified that around this same time, Jaden began forcing her to use methamphetamine by either making her smoke it or putting it inside her vagina. Madison had not previously used methamphetamine and did not use any drugs while she was pregnant with Leyton.

Over the course of the relationship, Jaden would punch and kick Madison and use "extension cords, brass knuckles, mace, flashlights, [and] metatarsal boots" to abuse her. He also stapled her with a staple gun and kicked her in the stomach while she was pregnant with Landyn. On one occasion, he sprayed a fire extinguisher in a bedroom and shut Madison in the room. When she began to pass out, he pulled her out of the room until she was able to catch her breath and asked her questions about who she had talked to and if she had hidden "any phones around the house." If he thought she was lying, he pushed her back into the room and repeated the events again. This incident occurred while Madison was pregnant with Landyn. On another occasion while she was pregnant, Jaden hit Madison in the face, laid her on the floor on her stomach, and "put a crowbar around [her] neck and pulled [her] up backwards."

Two additional incidents occurred in April and May 2017. During one incident, Jaden whipped Madison with an extension cord, sprayed her in the face with mace, and put her in a scalding hot bath. On the other occasion, he physically assaulted her, burned her knees with a torch, and threatened her with a knife, putting it to her neck and threatening to kill

- 99 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

her. Photographs of Madison's injuries from this incident were received into evidence at the termination hearing. As a result of these two assaults, Jaden was arrested and ultimately went to prison. At the time he was arrested in May, Madison ended the relationship, and she sought and obtained a protection order against him.

Madison explained that she never told anyone about the abuse because she was afraid of the repercussions from Jaden. She attempted to escape at times, but either she was unable to do so or, if she was, Jaden would come back for her. There were times during the relationship that she could not get away because she was locked in a closet. She explained that beginning in 2016 through the end of the relationship, there were periods of time where she was prohibited from even seeing daylight. Madison acknowledged that during her relationship with Jaden, she did not participate in the services provided by the Nebraska Department of Health and Human Services (DHHS), explaining that Jaden was still around so it was difficult for her to do so.

Beginning in the fall of 2017, however, after Jaden was incarcerated and the relationship was over, Madison began engaging in services and focusing on making progress in the case. She had attended outpatient drug and alcohol treatment with a licensed independent mental health practitioner, Emily Goodman, on just two occasions in March 2017. But Goodman recommended an updated evaluation, which resulted in an updated diagnosis of major depressive disorder and a recommendation of individual therapy rather than substance use treatment.

Madison began attending individual therapy with Goodman regularly in July 2017. Goodman testified at the termination hearing that as a result of the domestic violence Madison endured, she had one of the most severe cases of post-traumatic stress disorder (PTSD) that Goodman had seen. Madison suffered from daily nightmares, struggling to even sleep at night, and flashbacks that were some of the most detailed

- 100 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

and physiologically affective that Goodman had encountered. Goodman explained that PTSD is not something that can be "cured," and she said it will be something that will challenge Madison for the rest of her life. In Goodman's experience working with individuals with PTSD, there are times where things are going very well and times that are more difficult, and there are things that can trigger more struggles and flashbacks. With Madison specifically, because her trauma disorder was so greatly ingrained into her environment, Goodman would highly expect struggles and flashbacks. Madison's flashbacks and symptoms associated with her trauma disorder increased and decreased over the year that she worked with Goodman. Despite Madison's trauma, as of March 2018, Goodman believed that she was able to adequately and appropriately parent her children. Madison's treatment with Goodman ended in March when Goodman left on maternity leave. DHHS was to locate a new therapist, but our record does not indicate that one was immediately found.

As a result of Madison's progress in attending therapy, having visits with the children several times per week, and testing negative for drugs, the children were placed back with her on January 2, 2018. Thereafter, she began to feel overwhelmed and eventually relapsed with methamphetamine in March and stopped engaging in services. She also became involved in a relationship with a man with a criminal history and with whom she used drugs. The children were removed from Madison's care on July 2 and placed back in their previous foster home. They underwent hair follicle testing. Leyton tested positive for exposure to methamphetamine and marijuana, and Landyn tested positive for exposure to marijuana.

Shortly after the children were removed from Madison's care, she began attending individual therapy with Sarah Worley. An updated substance abuse evaluation was completed at that time. We note that prior to this date, Madison had not received any substantial substance abuse treatment because Goodman

- 101 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

had recommended individual therapy for her mental health instead. As her mental health progressed, her drug and alcohol screenings were all negative, so she was no longer appropriate for substance abuse treatment according to Goodman. The subsequent evaluation revealed that Madison was now "on the borderline" between needing residential treatment and intensive outpatient treatment. She initially elected to do residential treatment, and when she entered treatment in August 2018, she tested positive for methamphetamine—admitting that she had used drugs prior to entering. She was at treatment for only a few days before leaving against medical advice, in part because of another patient in the program whom she had known during her relationship with Jaden. Within a week of leaving the residential program, however, she began an intensive outpatient treatment program upon the recommendation of Worley.

Madison tested positive for methamphetamine in early September 2018, but thereafter, she completed the intensive outpatient program as well as a "step down" to the outpatient program. Madison tested positive in October for clonazepam, a drug for which she does not have a prescription, and for morphine in December. Madison denied using any drugs at any time after September and blamed the positive test in December on having eaten poppyseeds. According to Worley, the level of morphine in Madison's system was "[v]ery low" and consistent with her report of eating poppyseeds.

At the time of the termination hearing in February 2019, Madison was still attending weekly individual therapy with Worley, as well as attending a weekly group session and a domestic violence support group. She continued to have two visits per week with the children and to test clean for drugs. She obtained employment in October 2018 and was working 2 days per week until January 2019, when her employer cut her hours and told her she was no longer needed. She had ended her unhealthy relationship in September 2018, thereafter telling Worley that "they had broken up because of his drug use

- 102 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

and that he wasn't a good influence in her life." Several group sessions in October and November were facilitated by Worley, who testified that Madison had been very forthcoming about her struggles with relapse prevention, triggers, and staying away from people who were not good for her. Worley testified that over the previous 3 months, Madison had made "excellent" progress, that she had continuously attended therapy without missing any sessions, and that she had participated fully and had been honest about what happened to her and her responsibility. Worley's prognosis for Madison was "good." She testified that when she observed Madison with her children in the summer of 2017, Madison appeared to have a very secure bond with them, and that based on her work with Madison, Worley believed Madison was capable of parenting her children.

In general, the evidence revealed that the children are healthy and doing well. Leyton originally had issues with speech development, but an evaluation concluded that he did not qualify for services. In November 2018, he began seeing a therapist due to nightmares and night terrors, as well as being anxious and sad. Landyn was born with methamphetamine in his system; thus, he automatically qualified for services and meets with an early childhood education teacher once per month regarding his development.

The visitation supervisor testified that the children were well behaved and always very happy to see Madison. Leyton had difficulty leaving Madison at the end of visits and would often cry and demand that the visitation supervisor take him back to Madison. There were never safety concerns during visits, and Madison provided food and toys for the children and was very attentive—playing with them, interacting with them, and making sure their needs were being met. The visitation supervisor said that by the time she stopped working with Madison in December 2018, Madison had reached all of her goals except for obtaining housing (Madison was living with her parents).

- 103 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

Madison continued to live with her parents at the time of the termination hearing and testified that her relationship with them was "[g]ood," despite having issues in the past due to her drug use and her dishonesty about it. Worley testified that Madison's parents and sister are her support system to assist her in continuing to make progress. According to the caseworker, it is acceptable for parents to live with family when they get their children back. Despite this, the caseworker opined that terminating Madison's parental rights to Leyton and Landyn was in the children's best interests because Madison has been unable to demonstrate a sustained change necessary for her to provide a stable and permanent home for the children. Similarly, Leyton's therapist testified that Leyton needs permanency and that she encourages permanency as quickly as possible for children up to the age of 5 because the longer a child at this critical developmental age stays in foster care, the greater the risk for emotional and social damage.

Susan Michalski also testified at the termination hearing. Michalski is a registered nurse who has worked with the issue of domestic violence for 37 years and was the training and education director for the domestic violence coordinating council for 12 years. She explained that domestic violence, or intimate partner violence, is an intimate relationship where there is a definite power imbalance, and the key components are traumatic bonding through that imbalance and methodic isolation. Domestic violence occurs on an emotional, psychological, physical, sexual, and financial level and is very insidious. The trauma that occurs early in the relationship instills fear and anxiety in the victim as to what will happen to the victim when they try to get out of the relationship or once they have left the relationship. Michalski described victims of domestic violence as "living in a fog," and she said that sometimes they deny or minimize what is occurring or disbelieve that someone could or would do these kinds of things to them. Power and control are the core of domestic violence. Michalski explained that even if a victim is able to leave an abusive relationship, it

- 104 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

is common for the victim to go back to the abuser. Oftentimes the victim returns because of fear, but the choice to return could be financially driven, child driven, due to limited other support systems, or for other reasons.

According to Michalski, recovery from domestic violence takes time and the trauma from it can seep into every area of the victim's life. Substance abuse is often seen along with domestic violence because the violence causes significant "internal trauma," and drugs are used as a coping mechanism. Drugs are also a tactic abusers often use, by either getting the victim addicted to drugs or using drugs against the victim in some other way. If there are coexisting issues of domestic violence and substance abuse, it is expected that the recovery time would be longer. Recovery from domestic violence can be manifested in different ways, including the ability to function on a daily basis, securing employment, managing any emotional or psychological symptoms from the violence, or managing substance abuse; it can also mean having a better sense of self, having more information, and having better boundaries. Michalski related that age plays a role in overcoming trauma and that she had worked with very young people who have matured and grown over time. She opined that victims of domestic violence are able to successfully parent their children.

To this end, at the termination hearing, Madison testified that she used to take prescription anxiety medication but no longer needs it and that she had not recently had any flashbacks. She explained that learning to trust people and be honest has been difficult for her, but she believed that she was making progress. She also said that she has "found [her] voice" and learned how to ask for help. At the time of the final hearing, Madison was 21 years old.

After the conclusion of the termination hearing, the juvenile court entered a written order. Therein, without mention of the effects that Madison's PTSD may have had on her behavior, the court found that the allegations of the motion to terminate

- 105 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

Madison's parental rights were true by clear and convincing evidence and that termination was in the best interests of the children. The court therefore terminated Madison's parental rights to Leyton and Landyn. Madison appeals.

## ASSIGNMENTS OF ERROR

Madison assigns, restated, that the juvenile court erred in finding that (1) statutory grounds exist to terminate her parental rights and (2) termination of her parental rights was in the children's best interests.

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

The juvenile court found that the State established grounds for termination under § 43-292(2), (4), and (6) for both children and subsection (7) with respect to Leyton and that termination was in the best interests of the children. Madison asserts that the court erred when it determined that the State had presented sufficient evidence to terminate her parental rights. We agree. We first address whether the juvenile court erred in determining that termination of Madison's parental rights was in the children's best interests, because our resolution of this issue is dispositive of the appeal. See *In re Interest of Seth K. & Dinah K.*, 22 Neb. App. 349, 853 N.W.2d 217 (2014).

[2,3] Section 43-292 requires that parental rights can be terminated only when the court finds that termination is in the child's best interests. The foremost purpose and objective of the Nebraska Juvenile Code is the protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parents where the continuation of such parental relationship is proper under the law. *In re Interest of*

- 106 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

*Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003). The law is clear that in a termination of parental rights case, the State must prove by clear and convincing evidence that termination is in the best interests of the child. *Id*. To determine the child's best interests, the court must look at the evidence and assess the weight to be given that evidence. *Id*.

[4] The appellate courts of Nebraska have repeatedly cautioned that children cannot, and should not, be allowed to linger in foster care while waiting to see if the parent will mature. See, *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007); *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002); *In re Interest of Chloe C.*, 20 Neb. App. 787, 835 N.W.2d 758 (2013); *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). Similarly, where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

[5,6] However, whether termination of parental rights is in a child's best interests is not simply a determination that one environment or set of circumstances is superior to another, but it is instead subject to the overriding recognition that the relationship between parent and child is constitutionally protected. *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007). There is a rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent. *Id*. In determining whether it is in a child's best interests for the court to terminate parental rights, it is important to remember that the law does not require perfection of a parent. See *In re Interest of Seth K. & Dinah K., supra*. Instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between the parent and the child. *Id*.

Based on our de novo review of the record, we find that Madison has demonstrated a continued improvement in her

- 107 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

parenting skills and has established a beneficial relationship with her children. We consider Madison's initial lack of progress in light of her age and the abusive relationship she was in at the time. According to the evidence presented at the termination hearing, she began a relationship with Jaden in September 2015, when she was 18 years old and Leyton was 1 month old. Jaden quickly became controlling and, eventually, abusive, prohibiting her from even seeing the light of day at times. Michalski explained that perpetrators of domestic violence isolate their victims and that the abuse occurs on an emotional, psychological, physical, sexual, and financial level and is very insidious. The trauma that occurs early on in such a relationship instills fear and anxiety in the victim of what will happen if the victim tries to end the relationship or what will happen once the victim has left the relationship.

According to Michalski, abusers often get their victims addicted to drugs or use drugs against the victim in some way, and she said substance abuse is often seen as a coping mechanism for the internal trauma experienced by victims of domestic violence. So, while it would have been in the children's best interests for Madison to end her relationship with Jaden and engage in services at the outset of this case, her inability or unwillingness to do so must be viewed in consideration of her young age and the abusive relationship in which she was transfixed.

Madison was involved with Jaden until May 2017, when he was sent to prison for assaulting her. At that time, she was struggling to deal with the aftermath of the abuse. She admitted that she had not participated in the services designed to help her up until that time, explaining that Jaden was still around so it was difficult to do so.

Around the fall of 2017, however, Madison began to engage in services and focus on her case plan goals. At that time, her therapist, Goodman, decided that Madison needed individual therapy to address her mental health issues related to her PTSD rather than substance abuse treatment. Madison made

- 108 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

such progress that the children were returned to her care in January 2018. She quickly became overwhelmed with living in her own apartment, caring for the children on her own, and maintaining her sobriety from drugs, and she relapsed. This coincided with the time period when Goodman was leaving on maternity leave and a new therapist was to be assigned. The record is not clear on whether Madison failed to engage with a new therapist or if one was not immediately provided. Regardless, according to Worley, it is not unusual for someone suffering from PTSD or domestic violence trauma and substance abuse to relapse during recovery. Goodman testified similarly that because Madison's trauma disorder was so greatly ingrained into her environment, struggles and flashbacks were expected. And significantly, at that time, Madison had not received any substance abuse treatment from which she could learn coping skills without turning back to drugs or unhealthy relationships.

Since the children were removed from Madison's care in July 2018, Madison has completed intensive outpatient treatment and a "step down" to outpatient treatment. At the time of the last termination hearing, she continued to attend weekly therapy with Worley, group sessions, and a domestic violence support group. Worley testified in January 2019 that Madison had made excellent progress during the previous 3 months. She participated in several group sessions facilitated by Worley in October and November 2018 and was very forthcoming about her struggles. She also consistently attended therapy, without missing any sessions, and participated fully and honestly. Worley's prognosis for Madison was "good," and based on her work with Madison and her observations of Madison with her children, Worley believed, as of the time of the termination hearing, that Madison was capable of parenting her children.

While we acknowledge that there is evidence to the contrary, the totality of the evidence indicates that after Madison ended her relationship with Jaden, she made overall progress.

- 109 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

This is not to suggest that Madison is a perfect parent, and we recognize she continued to make some questionable choices throughout the case. However, most of these choices occurred before she engaged in mental health and substance abuse treatment. She has since engaged in individual therapy, and her drug test results have been negative for all substances—making such progress that the children were placed back with her. She relapsed, but since that time, she has completed two substance abuse programs, participated in therapy, attended a domestic violence support group, secured employment, and ended an unhealthy relationship. In addition, she has begun learning about self-improvement, such as learning to be more open and vulnerable, knowing her worth and what her children deserve, learning how to ask for help, and learning to trust and be honest. Accordingly, the evidence establishes Madison's continued improvement in parenting skills, and we find her relapse understandable in light of her circumstances.

[7] We recognize that case law provides that "'where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights.'" *In re Interest of Ryder J.*, 283 Neb. 318, 328, 809 N.W.2d 255, 263 (2012). And our Supreme Court has found on numerous occasions that a parent's last minute efforts are "too little, too late." See, e.g., *In re Interest of S.C., S.J., and B.C.*, 232 Neb. 80, 91, 439 N.W.2d 500, 507 (1989). Accord *In re Interest of Z.R.*, 226 Neb. 770, 415 N.W.2d 128 (1987). However, we must evaluate a parent's progress in the context of the situation in which the parent exists to determine whether he or she has been unable or unwilling to rehabilitate within a "reasonable time." See, e.g., *In re Interest of Chloe C.*, 20 Neb. App. 787, 795, 835 N.W.2d 758, 764 (2013). In doing so, we find that the termination of Madison's parental rights to her children came too quickly.

Madison received mental health treatment to address her severe PTSD from March 2017 until March 2018. When the

- 110 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

children were returned to her, she had not yet received substance abuse treatment, and Michalski explained that it is not uncommon for a victim of domestic violence to revert to known coping mechanisms in stressful situations. In Madison's case, these were substance abuse and poor choices in relationships. However, after the children were removed from Madison's care, she began substance abuse treatment in earnest in September 2018. She admits to a lapse in early September, but denies any further drug use. Even if we were to discredit this testimony and find that she had taken a nonprescribed medication once in October and ingested an illegal substance once in December, she was still in the early stages of treatment. The termination petition was filed in October, and trial began in December.

Given Madison's young age and trauma experience, we cannot find that the timeline of this case provides her with a "reasonable time" in which to rehabilitate herself. This is particularly true when Goodman prioritized the type of treatment offered to her, beginning with mental health therapy. Although substance abuse services were offered to her at the beginning of the case, that was at a time when she was involved in a relationship in which nearly her every move was controlled by her abusive partner. Goodman determined Madison first needed to address that relationship and her mental health before engaging in substance abuse treatment. Therefore, she received no substantial substance abuse treatment until just a few months prior to the filing of the termination petition.

In *In re Interest of Chloe C., supra*, we reversed the termination of a mother's parental rights based upon her continued progress. We recognized that although she lacked progress at the beginning of her case, she was in a "'cycle of violence'" that hampered her ability to do so. *Id*. at 796, 835 N.W.2d at 764. Once she engaged in therapy, she was able to break the cycle and made efforts toward meeting her case plan goals.

- 111 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

[8] Similarly, herein, the evidence at the termination hearing supports a finding that Madison's inability to progress at the beginning of her case was largely due to being a victim of domestic violence. Once she began mental health treatment, she progressed to the point at which DHHS recommended return of her children to her. And although she relapsed thereafter, she began substance abuse treatment in September 2018, prior to the filing of the termination petition. And her progress continued throughout the termination hearing, which ended in February 2019. It is proper to consider relevant evidence of facts that have transpired since the date of the filing of a termination petition, including parental efforts and behavior. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). Again, we are reminded that we do not require perfection of a parent when deciding whether termination of parental rights is appropriate. See *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010) (reversing termination of parental rights based on mother's progress despite need for additional improvement); *In re Interest of Eden K. & Allison L.*, 14 Neb. App. 867, 882, 717 N.W.2d 507, 518 (2006) (reversing termination of mother's parental rights due to having made positive strides despite prior "terrible decisions," use of methamphetamine, and incarceration). Having found that Madison has made continued progress, we turn to the relationship between her and her children.

The evidence reveals that Madison has a beneficial relationship with her children. It is undisputed that there is a strong bond between Madison and the children and that visits between them go very well. Prior to the filing of the termination petition, Madison had visits with the children three times per week; however, when the motion was filed, DHHS decreased the visits to twice a week, despite the fact that Madison was in compliance with all of the recommended services. The caseworker testified that it was her supervisor's policy to reduce visitation when a termination petition is filed. Madison consistently attended visits, particularly during

- 112 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

the latter part of the case. The children were always excited to see her and sad to leave her at the end of the visits. She brought food and toys for them; attended to their needs; was very attentive, playing and interacting with them; was affectionate with them; comforted them; and told them that she loves them.

We appreciate that Madison still has work to do before achieving reunification with Leyton and Landyn. However, this fact does not prohibit this court from finding that the State failed to prove that termination of Madison's parental rights was in the best interests of the children. See, e.g., *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003); *In re Interest of Seth K. & Dinah K.*, 22 Neb. App. 349, 853 N.W.2d 217 (2014); *In re Interest of Athina M.*, 21 Neb. App. 624, 842 N.W.2d 159 (2014); *In re Interest of Justin H. et al., supra*. In its order, the juvenile court did not discuss how Madison's PTSD or her young age may have affected her decisionmaking ability, despite Michalski's testimony on the effects of PTSD. While we are aware that children should not be suspended in foster care awaiting uncertain parental maturity, we find that given Madison's progress and the testimony of both Michalski and Worley, we are not convinced that she cannot put herself in a position to be reunified with her children within a reasonable amount of time with continued therapy and maturity. In the meantime, the children are in a loving foster family environment and the foster parents have a close and supportive relationship with Madison.

Upon our de novo review of the record, we conclude that the State has failed to prove by clear and convincing evidence that Madison is unable or unwilling to rehabilitate herself within a reasonable time and that the children's best interests are served by terminating her parental rights.

## CONCLUSION

We find that the juvenile court erred when it determined that the State proved by clear and convincing evidence that

- 113 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

terminating Madison's parental rights to Leyton and Landyn was in the children's best interests. Accordingly, the judgment of the juvenile court is reversed and the cause is remanded for further proceedings.

Reversed and remanded for
further proceedings.

PIRTLE, Judge, dissenting.

I respectfully dissent from the conclusion of the majority that the State has failed to demonstrate by clear and convincing evidence that the termination of Madison's parental rights is in the best interests of Leyton and Landyn. Rather, I would affirm the judgment of the juvenile court terminating Madison's parental rights.

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Jordana H. et al.*, 22 Neb. App. 19, 846 N.W.2d 686 (2014). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id*. In this case, the juvenile court observed witnesses over 8 days of trial on the State's motion to terminate parental rights. Among those testifying was Madison, whom the juvenile court specifically recognized has struggled with honesty throughout the duration of the case. Accordingly, where the evidence is in conflict, I would not disregard the juvenile court's observations across this extensive trial.

To terminate parental rights, the State must prove by clear and convincing evidence that one or more of the statutory grounds listed in § 43-292 have been satisfied and that termination is in the child's best interests. *In re Interest of Audrey T.*, 26 Neb. App. 822, 924 N.W.2d 72 (2019). The majority opinion does not reach the statutory grounds for termination, because it finds the best interests analysis dispositive of Madison's appeal. I would find that the State met its burden of

- 114 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

showing both that a statutory basis exists under § 43-292 and that termination is in the children's best interests.

## STATUTORY GROUNDS FOR
## TERMINATION

I agree with the juvenile court that at least one of the statutory bases for termination alleged by the State was met. Under § 43-292(2), termination is appropriate when "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection."

From the time the State first filed a juvenile petition in July 2016, up to the final order of the juvenile court terminating Madison's parental rights in April 2019, there have been ongoing issues that cause concern over the ability of Madison to raise these children. The July 2016 petition was filed, in part, because Madison left Leyton in the care of her mother without making proper provision for his care. There were additional concerns regarding Madison's use of methamphetamine. After the birth of Landyn, a supplemental petition was filed in March 2017, indicating that Landyn tested positive for amphetamines at birth and that Madison tested positive for opiates, oxycodone, and methamphetamine earlier that month. The record reflects that these concerns have not subsided over the duration of this case.

Despite the opportunity to correct the circumstances that led to the adjudication of her children, Madison has failed to show that she is able to provide them the necessary parental care and protection. A dispositional plan was entered on January 26, 2017, ordering Madison to participate in outpatient treatment for substance abuse, to abstain from the use of controlled substances and submit to random drug testing, to prevent any contact between Leyton and her boyfriend at the time, Jaden, and to pay $50 in monthly child support. Other dispositional hearings set similar goals for Madison, and included additional goals of participating in counseling to address healthy relationships, committing to provide

- 115 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

appropriate parenting and stable housing, and cooperating with family support services. However, as the juvenile court noted in its order, these goals have largely gone unmet throughout the duration of this case.

Madison admitted to relapsing into use of methamphetamine in March 2018. At the time, Madison had been living on her own with the two children, but quickly became overwhelmed, leading to her relapse. Additional drug tests in August, September, October, and December 2018 came back positive for methamphetamine and other controlled substances for which Madison did not have a prescription. Madison admitted she was "unmotivated" to find full-time employment, and she was only employed between October 2018 and January 2019, working 2 days per week during that time.

Madison also has not shown that she is able to maintain the level of support and care necessary for her children. While there have been periods of consistency with her visitation, and the children appear to have a close bond with Madison, my concerns persist. Madison was forced to abandon the apartment she briefly maintained on her own, due to her failure to pay rent. Madison also became overwhelmed at times after the children had been temporarily returned to her care, and she relied on the foster parents for respite care for the children. On more than one occasion, Madison failed to pick up the children at the agreed-upon time and was difficult to reach by the foster parents.

What is particularly concerning is Madison's inability to separate herself from the type of unhealthy relationships that precipitated many of her problems. I do not downplay the level of abuse in this case—nor the amount of control an abuser can exert over an innocent victim—but Madison has continued to surround herself with the wrong crowd, even after Jaden was imprisoned and their relationship ended. She resumed a relationship with Leyton's birth father after he was released from prison, resulting in her pregnancy with Landyn. She also began a relationship with Riley S. in April 2018. Madison admitted

- 116 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

in her testimony that she used drugs with Riley and that he was not a good influence on her. Nevertheless, this is someone she allowed to be near her children. The juvenile court specifically found that the testimony of Riley and Madison "did not appear credible and appeared to be situationally motivated by the pending termination of parental rights rather than any honest recognition by [Madison] that [Riley] was an unhealthy influence for her or for her children."

I simply do not believe Madison has shown that she is able to put the needs of the children above her own, nor that she is able to provide Leyton and Landyn the necessary care and protection required of a parent. Based upon my de novo review of the record, I would find that the State met its burden under § 43-292(2) and that a statutory basis for termination of Madison's parental rights exists.

## BEST INTERESTS

Based on the facts of this case, and the arguments set forth by both the State and the guardian ad litem, I believe the State has shown by clear and convincing evidence that it is in the best interests of the children that Madison's parental rights be terminated. While I recognize the severity of the horrendous abuse in this case, the primary focus of the best interests analysis is on the children, *not* the parent. While evidence to prove the statutory grounds for termination will often be "highly relevant to the best interests of the juvenile . . . statutory grounds are based on a parent's past conduct, but the best interests element focuses on the future well-being of the child." *In re Interest of Mya C. et al.*, 23 Neb. App. 383, 396, 872 N.W.2d 56, 67 (2015).

The majority concludes that "Madison's initial lack of progress in light of her age and the abusive relationship she was in" is grounds to find that termination came too quickly. I disagree. The first petition was filed in July 2016. A supplemental petition in regard to Landyn was filed in March 2017. In November 2016, Leyton was permitted to remain in his

- 117 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF LEYTON C. & LANDYN C.
Cite as 28 Neb. App. 95

maternal grandparents' home, where Madison was living at the time, but was later removed in February 2017. Landyn was immediately placed in a nonrelative foster home following his discharge from the hospital after his birth. Leyton was later placed in the same foster home. Despite being temporarily reunited with Madison in January 2018, the children were again removed in July and have remained in foster care ever since.

Furthermore, this is a case where an experienced lawyer was appointed as guardian ad litem, who was involved throughout the duration of the case. I find it particularly telling that the guardian ad litem filed a 54-page brief in this matter and appeared at oral argument, strongly advocating that the juvenile court's decision was correct in all respects. In a case such as this, where our decision may very well determine the future of these two young boys, I simply cannot disregard the professional observations of the guardian ad litem and her unwavering opinion that termination of Madison's parental rights was in the best interests of these children.

I believe this is precisely the type of case the majority describes as "too little, too late." See, e.g., *In re Interest of S.C., S.J., and B.C.*, 232 Neb. 80, 91, 439 N.W.2d 500, 507 (1989). Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or made to await uncertain parental maturity. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019) (citing *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015)). The record suggests that the children are doing well under the care of their foster parents and that the foster parents have been able to provide a stable home for the children. Based upon my de novo review of the record, I believe the State has shown by clear and convincing evidence that termination of Madison's parental rights is in the best interests of Leyton and Landyn, and I would have affirmed the judgment of the juvenile court.

For these reasons, I respectfully dissent.